# UNITED STATES *v.* ITT CONTINENTAL BAKING CO.

No. 73–1290. Argued November 13, 1974—
Decided February 19, 1975

224

*Deputy Solicitor General Friedman* argued the cause for the United States. On the briefs were *Solicitor General Bork, Assistant Attorney General Kauper, Howard E. Shapiro,* and *George Edelstein.*

*John H. Schafer* argued the cause for respondent. With him on the brief was *Michael Boudin.*

Mr. Justice Brennan delivered the opinion of the Court.

The question presented by this case is whether violations of the prohibition of a Federal Trade Commission (FTC) consent order against "acquiring" other companies constituted single violations within the meaning of the applicable civil penalty statutes, 38 Stat. 734, as amended, 15 U. S. C. § 21 (*l*); 38 Stat. 719, as amended, 15 U. S. C. § 45 (*l*), or whether such violations constituted a "continuing failure or neglect to obey" within the meaning of those statutes, authorizing imposition of daily penalties. The United States District Court for the District of Colorado interpreted the consent order to proscribe only the initial act of acquisition and held that therefore only a single penalty might be imposed. 1972 CCH Trade Cases ¶ 73,993, p. 92,127 (Aug. 2, 1971). The Court of Appeals for the Tenth Circuit affirmed the District Court to that extent, 485 F. 2d 16 (1973). A subsequent decision of the Court of Appeals for the Eighth Circuit is in conflict, *United States* v. *Beatrice Foods Co.,* 493 F. 2d 1259 (1974), cert. pending No. 73–1798. In interpreting a consent order worded in its pertinent terms similarly to that in this case, the Court of Appeals for the Eighth Circuit held that acquisition is a continuing offense until it is undone, noting that the construction of "acquiring" as a single rather than continuing violation "ignores the crucial effects of an acquisition and would render nonacquisition orders virtually meaningless." *Id.,* at 1270.

We granted certiorari in order to resolve this conflict between Courts of Appeals concerning the proper application of the "continuing" violation clauses of 15 U. S. C. §§ 21 (*l*) and 45 (*l*) to wording employed in a large number of FTC consent orders.[1] Since we inter-

---

[1] According to the Petition for Writ of Certiorari 18A–22A and

pret "acquiring" as used in the consent order in this case
to mean both the initial transaction and the maintaining
of the rights obtained without resale, we hold that viola-
tion of the consent order is a continuing violation subject
to daily penalties, and reverse.[2]

Brief for United States 12 n. 12 in this case, there were in all as of
June 18, 1974, 67 FTC orders, of which most are consent orders but
some are litigated orders, which bar acquisitions in language similar to
the language of the order in this case. All of these orders bar future
acquisitions but do not expressly bar the "holding" or "retention" of
stock or assets acquired in violation of their terms.

[2] The Petition for Certiorari of the United States presented the
single question whether its prayer for daily penalties was properly
denied. Respondent did not cross-petition, yet seeks to raise several
issues not presented by the petition. Respondent contends that
(1) the three transactions for which penalties have been or are to
be imposed did not violate the consent order; (2) the consent order
was not binding upon ITT Continental as successor after Continental
ceased to exist, so that daily penalties could not accrue for the
period after the merger; and (3) daily penalties could not be imposed
because the FTC had not advised respondent of the alleged
violations prior to the filing of the complaint. We do not address
any of these issues in deciding this case.

Respondent recognizes that, not having cross-petitioned, it can-
not attack the judgment insofar as it sustained the findings of
violations and imposed penalties for such violations. *United States
v. American Railway Express Co.*, 265 U. S. 425, 435 (1924).
Cf. *Morley Construction Co. v. Maryland Casualty Co.*, 300 U. S. 185
(1937). Respondent argues that it may nevertheless seek to sustain
the Court of Appeals' limitation on the penalties on the theory that
no penalty should have been awarded at all. Ordinarily, however, as
a matter of practice and control of our docket, if not of our power,
we do not entertain a challenge to a decision on the merits where
the only petition for certiorari presents solely a question as to
the remedy granted for a liability found to exist, even if the
respondent is willing to accept whatever judgment has already been
entered against him. *Strunk v. United States*, 412 U. S. 434, 437
(1973); *NLRB v. International Van Lines*, 409 U. S. 48, 52 n. 4
(1972); *NLRB v. Express Publishing Co.*, 312 U. S. 426, 431–432

# I

The FTC alleged in 1960 that Continental Baking Co. (Continental),[3] a major producer of bread and other bakery products, had violated § 7 of the Clayton Act, 38 Stat. 731, 64 Stat. 1125, 15 U. S. C. § 18, and § 5 of the Federal Trade Commission Act, 15 U. S. C. § 45, by various acquisitions which "may have the effect of substantially lessening competition or tending to create a monopoly . . . ." Before any decision in the case, the parties agreed to a proposed consent order which was approved by the FTC in May 1962. The order, among

---

(1941). Cf. *Langnes* v. *Green*, 282 U. S. 531, 538 (1931). But see *LeTulle* v. *Scofield*, 308 U. S. 415 (1940). We follow that rule of practice in this case, particularly because the issue of whether there were any violations concerns only a particular order as applied to a discrete set of facts and therefore would not merit this Court's grant of a petition for certiorari.

The courts below did not decide the other two issues because they were not pertinent once it was determined that there was no continuing violation. (The District Court did express the opinion that "it would seem unreasonable to permit the Commission to knowingly let daily penalties accrue without giving notice of the Commission's position at the earliest reasonable time," 1972 CCH Trade Cases ¶ 73,-993, pp. 92,127, 92,129 (Aug. 2, 1971), but it said that this statement was "obiter dictum.") In the absence of decisions on these questions by the courts below, we decline to address them. *FTC* v. *Anheuser-Busch, Inc.,* 363 U. S. 536, 542 (1960); *Jaffke* v. *Dunham,* 352 U. S. 280 (1957); *Aetna Casualty & Surety Co.* v. *Flowers,* 330 U. S. 464, 468 (1947). Cf. *Dandridge* v. *Williams,* 397 U. S. 471, 476 n. 6. (1970).

[3] Continental was merged on September 13, 1968, with a wholly owned subsidiary of International Telephone and Telegraph Corp. called ITT Continental Baking Company (ITT Continental). While ITT Continental has never contested its liability under the merger agreement for any violations of the consent order committed by Continental before the merger, it continues to maintain in this Court, as it did below, that it is not itself bound by the consent order. See n. 2, *supra.*

other things, prohibited Continental for 10 years [4] from "acquiring, directly or indirectly, through subsidiaries or otherwise, the whole or any part of the stock, share capital, or assets of any concern, corporate or non-corporate, engaged in any state of the United States in the production and sale of bread and bread-type rolls unless the Commission, on petition for modification of this Section III of this order, permits such an acquisition . . . ." Alleging that Continental had acquired assets in three companies in violation of this order, the Government brought suit in the District of Colorado under § 11 (*l*) of the Clayton Act, 15 U. S. C. § 21 (*l*) [5] and § 5 (*l*) of the Federal

[4] The consent order expired by its own terms on May 15, 1972. In April 1972, the FTC ordered ITT Continental to show cause why the order's ban on acquisitions should not be extended until April 1977. Although the administrative law judge recommended the extension, the FTC declined to approve the extension because of inadequate proof of increased concentration in the relevant local markets. *In re ITT Continental Baking Co.*, 84 F. T. C. 1349 (1974). However, the FTC did express a continuing concern with the levels of concentration in the baking industry. It issued an order requiring ITT Continental to inform the Commission "of any acquisitions of any interest in any concern engaged in the production and sale of bread and bread-type rolls, such report to be filed not less than sixty (60) days prior to each such acquisition." *Id.*, at 1400. ITT Continental and other members of the baking industry were informed that "[a]ny significant mergers in this industry, and particularly any that promise to raise concentration still higher in a metropolitan area that already appears to be dangerously close to the borderline between effective competition and effective monopoly, will receive the most searching attention from this agency." *Id.*, at 1399.

[5] Title 15 U. S. C. § 21 (*l*) provides:

"Any person who violates any order issued by the commission or board under subsection (b) of this section after such order has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $5,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the United States. Each separate

Trade Commission Act, 15 U. S. C. § 45 (*l*),[6] for civil penalties and other relief. The complaint prayed for penalties of $1,000 per day from the date of the contract of acquisition to the date of filing of the complaint on each of the three counts.

The District Court held that two of the three transactions were in fact in violation of the consent order. It declined, however, to order daily penalties, finding that "the terms of the consent order proscribe only the act of acquisition and that the violations of the consent order . . . did not constitute a 'continuing failure or neglect to obey' [15 U. S. C. §§ 21 (*l*), 45 (*l*)] said

---

violation of any such order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the commission or board each day of continuance of such failure or neglect shall be deemed a separate offense."

[6] Title 15 U. S. C. § 45 (*l*) provides:

"Any person, partnership, or corporation who violates an order of the Commission to cease and desist after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $5,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the United States. Each separate violation of such an order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the Commission each day of continuance of such failure or neglect shall be deemed a separate offense."

The maximum penalty for each violation under 15 U. S. C. § 45 (*l*) has since been increased from $5,000 to $10,000. Pub. L. 93-153, § 408 (c), 87 Stat. 591.

Although the Government requested $1,000 per day per violation, the statutes prescribe no minimum penalty, and the District Court has discretion to determine the amount of the penalty for each violation whether the transactions are construed as single or as continuing violations. Thus, while totaling the penalty as a series of daily violations rather than as a single violation could raise substantially the total penalty assessed, the statutory scheme does not require that result, and the trial judge's determination would prevail in the absence of an abuse of discretion.

order. . . . Once these two acquisitions were accomplished, the violations were complete." 1972 CCH Trade Cases, at 92,129. The District Court therefore entered a judgment against ITT Continental for $5,000 for each of the two violations found.[7]

The Court of Appeals reversed the District Court only insofar as it had held one of the three transactions not in violation of the consent order. It affirmed on the matter of daily penalties, holding that "whether the order was directed to the acquisition or to the acquisition and retention of assets or interests . . . [is] an interpretation of the consent order, and the result is in accordance with the prevailing standards." 485 F. 2d, at 21. Remand to the District Court was ordered only for imposition of a penalty for the third violation.

## II

The basic question before us is whether there has been a "continuing failure or neglect to obey" an FTC order within the meaning of 15 U. S. C. §§ 21 (*l*) and 45 (*l*).

The "continuing failure or neglect to obey" provision

---

[7] The complaint also requested a permanent injunction commanding future compliance with the consent order. The District Court found that it was empowered in a civil penalty proceeding based on an FTC order to grant equitable relief, and it issued an injunction in the exact words of the FTC order. This injunction expired, as did the consent order, on May 15, 1972. See n. 4, *supra*. Since the Court of Appeals decision in this case, Congress has amended 15 U. S. C. § 45 (*l*) expressly to empower district courts in civil penalty proceedings to grant equitable relief. Pub. L. 93–153, § 408 (c), 87 Stat. 591.

Although the complaint did not request a divestiture order, the Government later requested divestiture, and this request was embodied in the District Court's pretrial order. App. 27. However, the District Court declined to order this relief, 1972 CCH Trade Cases, at 92,129, and the Court of Appeals affirmed this denial as within the discretion of the trial court. 485 F. 2d 16, 21 (CA10 1973).

of § 45 (*l*) was added to the Federal Trade Commission Act in 1950, and the like provision of § 21 (*l*) to the Clayton Act in 1959. Although the legislative history of these provisions is sparse, some examples of behavior intended to be covered by the "continuing" violation provisions do appear in the legislative history. These include continuing conspiracies to fix prices or control production, maintenance of a billboard in defiance of an order prohibiting false advertising, failure to dissolve an unlawful merger, and failure to eliminate an interlocking directorate. See letter from FTC General Counsel to Senator Fulbright, 96 Cong. Rec. 3026–3027 (1950); Hearings on H. R. 432, H. R. 2977, H. R. 6049, and S. 726 before the Antitrust Subcommittee of the House Committee on the Judiciary, 86th Cong., 1st Sess., 21 (1959); H. R. Rep. No. 580, 86th Cong., 1st Sess., 7 (1959). These violations share two discernible characteristics: the detrimental effect to the public and the advantage to the violator continue and increase over a period of time, and the violator could eliminate the effects of the violation if it were motivated to do so, after it had begun. Without these characteristics, daily penalties for such violations would probably have no greater deterrent effect than a single penalty and accumulating daily penalties would therefore be unfair.

The legislative history also makes clear that Congress was concerned with avoiding a situation in which the statutory penalty would be regarded by potential violators of FTC orders as nothing more than an acceptable cost of violation, rather than as a deterrence to violation. For example, Senator Aiken, chief proponent of the 1950 amendment, said that if daily penalties for certain violations of the Federal Trade Commission Act were not permitted, "the fine would amount to a license in the amount of $5,000 for misrepresentation, which would be a very cheap fine, indeed." 96 Cong. Rec. 3025 (1950).

Similarly, the House of Representatives Judiciary Committee said in its report on the 1959 amendments:

> "Although the maximum penalty may be severe, in certain cases it would be appropriate. In the absence of the maximum penalty for a continuing offense, for example, commission and board orders with respect to mergers and interlocking directorships would be ineffective. In such cases, unless the maximum penalty applied and each day of a continuing violation considered a separate offense, an order dissolving an unlawful merger could be ignored after the mere payment of a $5,000 fine." H. R. Rep. No. 580, 86th Cong., 1st Sess., 7 (1959).

See also Hearings on H. R. 432, H. R. 2977, H. R. 6049, and S. 726, *supra,* at 30 (letter from FTC General Counsel).

Thus, the "continuing failure or neglect to obey" provisions of 15 U. S. C. §§ 21 (*l*) and 45 (*l*) were intended to assure that the penalty provisions would provide a meaningful deterrence against violations whose *effect* is continuing and whose detrimental *effect* could be terminated or minimized by the violator at some time after initiating the violation. It seems apparent that acquisition in violation of an FTC order banning "acquiring" certain assets could be such a violation. Any anticompetitive effect of an acquisition continues as long as the assets obtained are retained, and the violator could undo or minimize any such effect by disposing of the assets at any time after the initial transaction. On the other hand, if violation of an order prohibiting "acquiring" assets were treated as a single violation, any deterrent effect of the penalty provisions would be entirely undermined, and the penalty would be converted into a minor tax upon a violation which could reap large financial benefits to the perpetrator. As we have seen, Congress

added the continuing-penalty provisions precisely to avoid such a result.

### III

Respondent insists, however, that the underlying FTC order was a consent order proscribing only the initial act of acquisition, and that therefore the imposition of daily penalties which might otherwise be mandated cannot be permitted. Its argument is that "acquiring" in the consent order unambiguously refers only to the initial transaction, and that to read it otherwise is to add the words "holding" or "retaining" assets to the literal language of the order. This addition to the language of the order, ITT Continental contends, violates the principle of a line of cases culminating in *United States* v. *Armour & Co.*, 402 U. S. 673 (1971), that any command of a consent decree or order must be found "within its four corners," *id.*, at 682, and not by reference to any "purposes" of the parties or of the underlying statutes. See *United States* v. *Atlantic Refining Co.*, 360 U. S. 19 (1959); *Hughes* v. *United States,* 342 U. S. 353 (1952). Respondent asks us to conclude that the "acquirings" prohibited by the consent order are not capable of persisting over time, and that therefore there can be no "continuing failure or neglect to obey" the order. The Government, on the other hand, contends that the parties meant "acquiring" to include both purchase and retention of assets, and that therefore it is unnecessary to depart from the "four corners" rule of *Armour* to conclude that there has been a continuing violation.

In *Armour,* it was first determined that the construction of the consent decree urged by the Government was inconsistent with the express terms of the consent decree it was seeking to enforce.[8] The decree involved in

---

[8] The Court in *Armour* noted that the Government might be able to obtain the relief sought in ways other than by construction of the

*Armour* was the Meat Packers Consent Decree of 1920, entered in settlement of an antitrust case filed in District Court. Paragraph fourth of the decree enjoined Armour from engaging in certain businesses. The Greyhound Corporation, which was engaged in some of those businesses, acquired control of Armour. The Government claimed that this acquisition was in violation of the consent decree, contending that the purpose of the decree was structurally to separate the meatpackers from the retail food business entirely, and that the relationship between Armour and Greyhound was therefore prohibited.

The Court noted that the language of the decree *"taken in its natural sense,* bars only active conduct on the part of the defendants. . . . [T]he decree does not speak in terms of relationships in general, but, rather, prohibits certain behavior, and in doing so prohibits some but not all economic interrelationship between Armour and the retail food business. . . . In short, we do not find in the decree a structural separation such as the Government claims. . . . [T]he decree leaves gaps *inconsistent* with so complete a separation." 402 U. S., at 678, 680. (Emphasis supplied.)

Similarly, in both *Atlantic Refining* and *Hughes* the Court first undertook to determine whether the language of the decree could support the construction urged by

consent decree. First, it could have brought a new action to enjoin the acquisition under § 7 of the Clayton Act. Second, "if the Government believed that changed conditions warranted further relief against the acquisition, it could have sought modification of the Meat Packers Decree itself." 402 U. S., at 674–675 Respondent argues that these alternatives are also present in this case, and that it is therefore unnecessary to adopt the construction of the order urged by the Government. However, the possible availability of other means of obtaining sanctions against the acquisitions challenged here cannot preclude the Government from obtaining whatever penalties may be proper for violations of the consent order.

the Government and concluded that it could not. In *Hughes*, the decree provided that Hughes was *either* to dispose of his stock in a certain corporation *or* commit the voting rights of his stock to a trustee "until [he] shall have sold his holdings of stock." 342 U. S., at 355 n. The Court said: "A reading of the either/or wording *would make most persons believe* that Hughes was to have · a choice of two different alternatives. Hughes would have no choice if the first 'alternative' was to sell the stock and the second 'alternative' was also to sell the stock." *Id.*, at 356. (Emphasis supplied.) Therefore, the Court concluded, the consent decree could not be construed, as the Government desired, to require Hughes to sell his stock.

In *Atlantic Refining*, the Court concluded that the construction urged by the Government was a "strained construction," 360 U. S., at 22, inconsistent with the "normal meaning," *id.*, at 23, of the language used. It commented that if the parties had intended the meaning urged by the Government, "one can hardly think of less appropriate language." *Id.*, at 22.

In all three of these cases, it was only *after* concluding that the language, fairly read, could not support the Government's construction that the Court turned to the contention that the restrictive reading was inconsistent with the purposes of the decree and of the antitrust laws assertedly violated. It was in this context that the Court noted that, because consent decrees are normally compromises in which the parties give up something they might have won in litigation and waive their rights to litigation, it is inappropriate to search for the "purpose" of a consent decree and construe it on that basis. "[T]he *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing

purposes as the respective parties have the bargaining power and skill to achieve. . . . [T]he instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." [9] *Armour*, 402 U. S., at 681–682. Thus, the basic import of *Armour, Atlantic Refining*, and *Hughes* is that, since consent decrees and orders have many of the attributes of ordinary contracts,[10] they should be construed basically as con-

---

[9] In *Hughes* v. *United States*, 342 U. S. 353 (1952), the Court likewise rejected an invitation to further the asserted "purposes" of the consent decree by approving an interpretation the "language cannot support." *Id.*, at 356. It noted that evidence might show that the sale requirement was justified, but it regarded the construction urged by the Government as effecting "a substantial *modification* of the original decree." *Id.*, at 357. (Emphasis supplied.) While it believed this modification could be had after a proper hearing proving the need for such modification under applicable standards, it would not sanction such modification in the guise of construing a consent decree. *Id.*, at 357–358.

Similarly, in *United States* v. *Atlantic Refining Co.*, 360 U. S. 19 (1959), while the Court agreed that the interpretation offered by the Government might better effectuate the purposes of the acts assertedly violated, this "does not warrant our substantially *changing* the terms of a decree to which the parties consented without any adjudication of the issues. And we agree with the District Court that accepting the Government's present interpretation would do just that." *Id.*, at 23. (Emphasis supplied.) Again, the Court noted that modification might be appropriate, but modification disguised as construction was not. See also *Liquid Carbonic Corp.* v. *United States*, 350 U. S. 869 (1955), rev'g 123 F. Supp. 653 (EDNY 1954); *United States* v. *International Harvester Co.*, 274 U. S. 693 (1927).

[10] Consent decrees and orders have attributes both of contracts and of judicial decrees or, in this case, administrative orders. While they are arrived at by negotiation between the parties and often admit no violation of law, they are motivated by threatened or pending litigation and must be approved by the court or administrative agency. Compare *United States* v. *Swift & Co.*, 286 U. S. 106, 115

tracts, without reference to the legislation the Government originally sought to enforce but never proved applicable through litigation.

We note that this case differs from *Armour, Hughes,* and *Atlantic Refining* in a most important respect. In each of those cases the question of whether or not the consent decree was violated was the question for decision; in this case respondent was found to have committed violations, and the issue before us affects only the manner of assigning penalties for each violation found. Thus, respondent is subject to some penalty, and there is no possibility as there was in *Armour, Atlantic Refining,* and *Hughes* that respondent will be penalized for behavior not prohibited at all by the order "within its four corners," *Armour,* 402 U. S., at 682. Nothing in the consent order suggests that although the parties agreed that Continental would refrain from "acquiring," they also agreed to limit the penalties which would otherwise apply if Continental did not refrain from that behavior. Such an agreement would be exceedingly odd, for it would undermine whatever prohibitions were imposed. As we have seen, Part II, *supra,* it is quite possible that under §§ 21 (*l*) and 45 (*l*) violation of an FTC adjudicated order against "acquiring" would be subject to daily penalties. It is not clear that *Armour* would require a different result merely because we are dealing with a consent order, since the parties reached no agreement at all concerning penalties to be applied in case of violation of the order.

(1932), with the language in *Armour* cited in the text, *supra,* at 235–236. Because of this dual character, consent decrees are treated as contracts for some purposes but not for others. See Jinkinson, Negotiation of Consent Decrees, 9 Antitrust Bull. 673, 675–676 (1964); Handler, Twenty-fourth Annual Antitrust Review, 72 Col. L. Rev. 1, 33–34 (1972).

We need not, however, determine whether §§ 21 (*l*) and 45 (*l*) would permit the imposition of daily penalties even if the consent order must be read as respondent maintains to proscribe only the initial act of acquisition. For we agree with the Government that the order "as it is written" does support an interpretation that the act of acquisition continues until the assets acquired are disgorged.

## IV

Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree.[11] Such reliance does not in any way depart from the "four corners" rule of *Armour*.

In this case, the consent order was part of an agreement between the parties entitled "Agreement Containing Consent Order to Divest and to Cease and Desist." The agreement incorporates by reference an "appendix," which sets forth at length the background leading to the complaint and the proposed order. In addition, the agreement provides that "[t]he complaint may be used in construing the terms of the order." Since the parties themselves so provided, both the appendix and the complaint are proper aids to the construction of the order and of the agreement of which it is part.[12]

---

[11] "Assuming that a consent decree is to be interpreted as a contract, it would seem to follow that evidence of events surrounding its negotiation and tending to explain ambiguous terms would be admissible in evidence." Handler, *supra*, n. 10, at 23 n. 148.

[12] Respondent argues that even if the complaint and appendix can be used as aids to construction, they only show that the parties could use broader language than that in the order itself, making

The complaint alleged that Continental had pursued "a continuous practice of *acquiring* various bakeries throughout the United States" (emphasis supplied), which were thereby "eliminated . . . as independent competitive factors in the manufacture, sale and distribution of bread and bread-type rolls . . . ." If the "acquiring" against which the order and the complaint incorporated in it were directed were limited to the single transaction by which Continental obtained rights in another company, it is hard to see why the effect which the complaint alleged followed from acquisitions would necessarily occur. For if Continental had sold the companies acquired as soon as the initial transactions were completed to other, independent companies, the bakeries would not have been "eliminated . . . as independent competitive factors."

Reference to the appendix also supports the conclusion that "acquiring" as used in the order means both the initial transaction granting Continental rights in an independent bakery and the maintaining of those rights without resale. The appendix notes: "One of the principal problems in the baking industry is the tendency towards concentration and the continuous growth of major baking companies *through acquisition.* Such *acquisitional growth* and tendency towards concentration places in the hands of a few large companies the means to set the pattern of competition . . . . If this order is

---

the limited language actually used highly significant and controlling. One Court of Appeals has used similar reasoning to approve a strict reading of a consent decree which was accompanied by a collateral agreement. *Artvale, Inc.* v. *Rugby Fabrics Corp.,* 303 F. 2d 283 (CA2 1962). However, this reasoning is erroneous as applied to this case. Where parties in one agreement include both a consent order and an explanation of that order, and also provide that the complaint is to be used to construe the order, it seems logical to conclude that, at least as to interpretations not precluded by the words of the order itself, the collateral documents can and should be used to give meaning to the words of the order.

adopted by the Commission, the respondent's alleged continuous practice of *acquiring* companies baking and selling bread and bread-type rolls will be brought to a halt . . . ." (Emphasis supplied.) It is apparent that the "acquisitional growth" referred to in the appendix cannot be achieved merely by discrete transactions without reference to what is done with the assets obtained after those transactions. If Continental were merely a speculator in baking companies, buying assets in them and selling them soon thereafter, it would not necessarily create "through acquisition" a "tendency towards concentration" giving it the "means to set the pattern of competition." Thus, "acquiring" in both the appendix and the order, parts of the same agreement, must mean obtaining and retaining assets, not merely the former.

Even without the aid of these explanatory documents properly usable to construe this particular order, we would have to conclude that "acquiring" as used in an antitrust decree or order continues until the assets obtained are disgorged. As the foregoing analysis of the ancillary documents here illustrates, "acquiring" and related words do not, as respondent insists, unambiguously refer to a single transaction. Rather, as a matter of ordinary usage they can, and in the antitrust context they do, encompass the continuing act of obtaining certain rights and treating them as one's own. We must assume that the parties here used the words with the specialized meaning they have in the antitrust field, since they were composing a legal document in settlement of an antitrust complaint.

We need not go beyond the Clayton Act itself to conclude that "acquisition" as used in § 7 of the Act means holding as well as obtaining assets. The Act provides that the FTC, if it finds a violation of § 7, can require a party to "divest itself of the stock, or other share capital, or assets, *held . . . contrary to the provisions* of [§ 7]."

15 U. S. C. § 21 (b). (Emphasis supplied.) Thus, the framers of the Act did not regard the terms "acquire" and "acquisition" as unambiguously banning only the initial transaction of acquisition; rather, they read the ban against "acquisition" to include a ban against holding certain assets.

This Court's opinions reflect the same understanding. For example, in *FTC* v. *Western Meat Co.*, 272 U. S. 554 (1926), the Court, in discussing an FTC order based on a violation of § 7, said: "The order here questioned was entered when respondent actually *held and owned* the stock *contrary to law.* The Commission's duty was to prevent the *continuance of this unlawful action* by an order directing that it cease and desist therefrom and divest itself of *what it had no right to hold."* *Id.,* at 559. (Emphasis supplied.) See also *Arrow-Hart & Hegeman Elec. Co.* v. *FTC,* 291 U. S. 587, 596–599 (1934).

Similarly, this Court's opinion in *United States* v. *Du Pont,* 353 U. S. 586 (1957), rests upon the conclusion that "acquisition" can mean, and in the context of § 7 of the Clayton Act does mean, both the purchase of rights in another company and the retention of those rights.

In *Du Pont,* a § 7 case was brought in 1949 but based on a purchase of stock by Du Pont in 1917–1919. It was argued that "the Government could not maintain this action in 1949 because § 7 is applicable only to the acquisition of stock and not to the holding or subsequent use of stock." 353 U. S., at 596–597. Thus, Du Pont was seeking to interpret "acquire" as used in § 7 [13] much as

---

[13] The first paragraph of § 7, at the time the *Du Pont* case was brought, provided:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share

respondent here seeks to read "acquiring" in the consent decree.

The Court in *Du Pont* rejected the interpretation urged upon it. Instead, the Court held that there is a violation "any time when the acquisition threatens to ripen into a prohibited effect. . . . To accomplish the congressional aim, the Government may proceed at any time that an acquisition may be said with reasonable probability to contain a threat that it may lead to a restraint of commerce or tend to create a monopoly of a line of commerce." *Id.*, at 597. Thus, there can be a violation at some time later even if there was clearly no violation— no realistic threat of restraint of commerce or creation of a monopoly—at the time of the initial acts of acquisition. Clearly, this result can obtain only because "acquisition" under § 7 is not a discrete transaction but a status which continues until the transaction is undone.[14]

---

capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce." 15 U. S. C. § 18 (1946 ed.).

The statute was amended in 1950 to provide:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U. S. C. § 18.

While the change in the wording is substantial, no reason suggests itself why the meaning of "acquire" and "acquisition" should differ in the two versions. *Du Pont* was decided several years after the 1950 amendments and makes not the slightest suggestion that the result pertinent here would not obtain under the new version.

[14] The dissent in *Du Pont* recognized that this was the import of

Thus, under the order "as it is written," "acquiring" must mean both the act of first obtaining assets and the retention and use of those assets. To conclude otherwise would be to ignore the flexibility of the English language, as well as the circumstances surrounding the order and the context in which the parties were operating. And, since the order bans the continuing act of obtaining and retaining certain assets, a violation of the order is a "continuing failure or neglect to obey" it, and daily penalties may be imposed under 15 U. S. C. §§ 21 (*l*) and 45 (*l*).

Because the Court of Appeals erred in concluding that daily penalties could not be imposed, we reverse and remand for proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEWART, with whom THE CHIEF JUSTICE, MR. JUSTICE POWELL, and MR. JUSTICE REHNQUIST join, dissenting.

The respondent's predecessor, Continental, made corporate acquisitions in violation of a 1962 consent order that, in pertinent part, prohibited Continental from "acquiring" described baking companies. The Government

---

this holding, with which it disagreed. 353 U. S. 586, 619–621 (1957) (Burton, J., dissenting).

Some lower federal courts have also recognized that the status approach to acquisition is the proper one. See *Gottesman* v. *General Motors Corp.*, 414 F. 2d 956, 965 (CA2 1969): "[T]he very acquisition and position of potential control which was found violative of the Clayton Act as of 1949 [in *Du Pont*] continued through 1961. . . . [W]hat was unlawful was du Pont's *status* as stockholder in General Motors, and that status continued until divestiture." (Emphasis supplied.) See also *United States* v. *Schine*, 260 F. 2d 552, 555–556 (CA2 1958): "[I]t is the *maintenance* of conditions in violation of the decree [prohibiting acquisitions, among other things] which is the charge against the respondents." Therefore, the court in *Schine* concluded, it was irrelevant that the initial transactions occurred prior to the statutory limitations period.

sought to impose daily penalties upon Continental for the continued holding of those assets. The Government's theory was that daily penalties were appropriate because Continental's retention of the assets was a "continuing failure or neglect to obey a final order," within the meaning of the relevant civil penalties statutes, 15 U. S. C. §§ 21 (*l*), 45 (*l*).[1] The issue in this case is whether the consent order can be so construed.[2] The District Court and the Court of Appeals ruled that the consent order prohibited only the distinct acts of "acquiring" the bakeries, not the "retaining" or the "holding" of the assets after acquisition. The Court of Appeals indicated that an order to divest would have been an appropriate remedy for the unlawful acquisitions, but held that the retention of the assets was not in itself a continuing refusal to obey the consent order such as would support the sanction of daily penalties. I think that under our controlling precedents, the District Court and the Court of Appeals were clearly correct.

The governing rule of construction, and its rationale, were stated plainly and aptly by this Court in *United States* v. *Armour & Co.*, 402 U. S. 673, 681–682 (1971):

> "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk,

---

[1] These provisions are set out in full in the Court's opinion, *ante*, at 228–229, nn. 5, 6.

[2] For the reasons stated by the Court, I agree that the other issues that the respondent seeks to raise in this case need not and should not be addressed.

the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. *For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.* Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." (Emphasis added; footnote omitted.)

See also *United States* v. *Atlantic Refining Co.,* 360 U. S. 19 (1959); *Hughes* v. *United States,* 342 U. S. 353 (1952).

The application of this straightforward standard to the consent order here is hardly a difficult task. The order literally prohibits only the "acquiring" of the forbidden assets. Once an acquisition was consummated, the violation was complete. A prohibition on the retention of assets cannot be found in any provision of the order. Because the order is a compromise agreement negotiated without any adjudication of antitrust liability, we are not at liberty under *Armour* to construe the unambiguous term "acquiring" in the light of conjecture or argument about the "purposes" of the decree or of the parties. We may not, consistent with *Armour,* conclude that the Government intended that the order should prohibit as a continuing offense the retention of unlawfully acquired

assets, when the Government did not insist upon language objectively manifesting that intention. Nor may we conclude that Continental agreed to restrict its future business conduct or become subject to penalties in any manner not clearly delineated in the order itself. The provisions of the order are something less than the Government could have sought and might have obtained. The rule of construction of consent decrees, however, depends, not upon an expedient construct of what the parties are thought to have intended, but upon the explicit provisions to which the parties have agreed.

After giving a casual nod in the direction of the standard of construction required by *Armour,* the Court embarks upon a laborious search for "purposes" that are "incorporated in" the consent order in order to change the meaning of the unambiguous term "acquiring." We are led through the antecedent complaint, through an appendix to the consent order, through the intricacies of an opinion of this Court construing the term "acquisition" in light of the policies underlying the Clayton Act, and through the legislative history of the statutory provisions that impose daily penalties for continuing refusals to obey Commission orders. Drawing upon these disparate sources, the Court determines that the consent order, despite its literal language, must be construed to prohibit not only the proscribed acquisitions but also the "retention" of unlawfully acquired assets.[3] One is re-

---

[3] Upon this premise, the Court then proceeds to hold that the conjured-up "continuing offense" of retaining these assets is a "continuing failure or neglect to obey a final order" within the meaning of the daily-penalty statutes. 15 U. S. C. §§ 21 (*l*) and 45 (*l*). But even if the consent order could be correctly read to prohibit not only the acquisition of the described assets but also the retention of assets unlawfully acquired, it is far from crystal clear that the "continuing offense" of retaining the assets would be a "continuing failure or neglect to obey a final order" within the meaning of the

minded of an observation once made by Mr. Justice Grier in a somewhat different context: "[T]he fact that it required so ingenious and labored an argument by my learned brother to vindicate such a construction . . . seems to me, of itself, conclusive evidence that the construction should not be given to it." *The Binghamton Bridge,* 3 Wall. 51, 83 (dissenting opinion).

What the Court does today is to proclaim a new rule of construction for consent orders or decrees totally at odds with our previous decisions:

> "Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree." *Ante,* at 238.

This novel approach, for which the Court cites not a single supporting precedent, is directly contrary to the "four corners" rule of *Armour.* For an inquiry into the *purpose* of a consent decree is precisely what that rule forecloses: "[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." 402 U. S., at 682. The Court today thus indulges in precisely the exercise that *Armour* sought to preclude:

---

daily-penalty statutes. Penalty provisions must be strictly construed, and due process requires that such provisions must give fair warning of the conduct that invokes their extraordinary sanction. Cf. *Giaccio* v. *Pennsylvania,* 382 U. S. 399. The legislative history of the daily-penalty statutes, as recited in the Court's opinion, shows that the mischief sought to be remedied was precisely the mischief to which Congress addressed its language: a "continuing failure or neglect to obey a final order," as, for example, the refusal to divest after a specific order of divestiture has been entered.

a wide-ranging search for a "purpose" in a decree that, as explained in *Armour,* cannot be said to have a purpose except to delineate explicitly the terms and provisions of the settlement that the parties negotiated.[4]

Before straining to pull the Government's chestnuts out of the fire, the Court should count with greater care the costs of abandoning the rule stated in *Armour.* Until today, the parties to any consent decree could have confidence that its explicit terms alone would control the judicial construction of its prohibitory language. Now, otherwise unambiguous terms of a consent decree may be construed in light of such considerations as the ante-

---

[4] Whatever the utility of extrinsic aids in construing a typical commercial contract, this technique is singularly inappropriate in an area where certainty of prohibition is necessary and where, as *Armour* makes clear, there can be found no guiding purpose underlying a negotiated decree. Moreover, even assuming, *arguendo,* that such aids might be admissible to construe borderline issues of application—for example, whether a particular acquired company was engaged in the production of "bread-type" rolls within the meaning of the consent order—such aids must not be used to impose a wholly separate prohibitory requirement upon a company that consented to be bound only by the plain language of the consent order. This is demonstrably not a case of ambiguity or of borderline construction. It is a case, instead, where the Court has used extrinsic aids to alter a term that is, on its face, wholly unambiguous.

The Court relies upon the decision in *United States* v. *Du Pont,* 353 U. S. 586, for the proposition that the term "acquire" in a consent order is a term of art that prohibits a "status which continues until the transaction is undone." *Ante,* at 242. But the Court's reliance on the policy considerations discussed in the *Du Pont* opinion is wholly inconsistent with the *Armour* rule. The opinion in *United States* v. *Du Pont* does not, in any event, render the term "acquiring" in a consent decree a term of art. That case addressed the positive reach of the Clayton Act under certain circumstances. The Court fails to explain how its opinion there has served to transform the plain term "acquiring" into a "term of art" that would by common understanding have the meaning that the Court today ascribes to it.

cedent complaint, the "meaning" of antitrust decisions, and the policies said to underlie the statutory provision for daily penalties. Certainty and reasoned reliance have always been the *sine qua non* of the consent orders that terminate about 70% to 80% of the antitrust complaints that are filed by the Justice Department.[5] But after today's decision that kind of certainty will no longer exist. For there will be no apparent limit on the power of the judiciary to alter the plain language of an order in light of the "circumstances surrounding the order and the context in which the parties were operating." *Ante,* at 243. If a negotiated consent decree fails to leave a dispute clearly and firmly settled, the necessary result will be that those charged with antitrust violations will be less inclined to settle their cases and more apt to insist upon time-consuming and costly litigation. Today's decision will also pose serious difficulties for the enforcement of all existing and all future consent decrees. For, as Mr. Justice Jackson once observed, "the validity of a doctrine does not depend on whose ox it gores."[6] The same purpose-oriented techniques of construction that the Court today serves up to expand this consent order beyond its terms can be expected to be availed of by alleged violators of consent orders who will seek to narrow and thereby to evade the plain language of any prohibition.

The Court concludes that "if violation of an order prohibiting 'acquiring' assets were treated as a single violation, any deterrent effect of the penalty provisions would be entirely undermined, and the penalty would be converted into a minor tax upon a violation which could reap large financial benefits to the perpetrator." *Ante,*

---

[5] Note, 73 Col. L. Rev. 594 (1973).

[6] *Wells* v. *Simonds Abrasive Co.,* 345 U. S. 514, 525 (dissenting opinion).

at 232. This is not merely overstatement; it is incorrect. Both the parties agree, and the Court of Appeals held, that an order to divest unlawfully acquired assets is an appropriate remedy for violation of a consent order barring acquisition. Moreover, the *Armour* rule of construction would not impair in any way the power of the Government, in future cases, to obtain through negotiations consent orders that contain a clear and explicit description of the conduct that is prohibited.[7]

In my view, the Court's departure from precedent threatens to retard significantly the effective use of consent decrees in the administration of the antitrust laws. I would adhere to the rule stated in *Armour* that "the scope of a consent decree must be discerned within its four corners, *and not by reference to what might satisfy the purposes of one of the parties to it.*" 402 U. S., at 682 (emphasis added). Applying this standard, I would affirm the considered judgments of the District Court and the Court of Appeals.

---

[7] The Government informs us that as of May 1974 there were outstanding 54 consent orders with language that prohibits acquiring certain assets but does not expressly prohibit the retaining of these assets. This Court need not assume that flagrant violations of consent orders will occur or that the remedies of divestiture and fine for the single offense of acquisition will not adequately deter unlawful conduct.