**NATURAL RESOURCES DEFENSE COUNCIL, INC., Plaintiff,**

v.

**William K. REILLY, et al., Defendants.**

Civ. A. No. 79–3442.

United States District Court, District of Columbia.

Jan. 14, 1992.

---

Eric Glitzenstein, Katherine Meyer, Harmon, Curran, Gallagher & Spielberg, Robert Adler, Natural Resources Defense Council, Washington, D.C., for plaintiff.

Mary E. Ward, Environmental Defense Section, Dept. of Justice, David Gravallese, Washington, D.C., for defendants.

David Deal, Ellen Siegler, Washington, D.C., for intervenor.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This Court has before it two motions by plaintiff to enforce a consent decree that established deadlines for the Environmental Protection Agency ("EPA") to promulgate water pollution regulations for the offshore oil and gas extraction industry. On April 5, 1990, this Court entered a Final Order and Decree that incorporated a Settlement Agreement signed by the parties. On December 21, 1990, plaintiff filed a Motion to Enforce Consent Decree and For Order to Show Cause, seeking relief from defendants' alleged failure to comply with the Court's November 16, 1990 deadline for the proposal of water pollution regulations for the offshore oil and gas industry. On April 22, 1991, plaintiff filed its Second Motion to Enforce Consent Decree seeking relief from defendants' alleged violation of the consent decree by not proposing any effluent limitations for radium–226 and radium–228. Defendant EPA opposes. For the reasons that follow, we deny both motions.

## BACKGROUND

These motions arise out of a fifteen-year dispute whereby plaintiff Natural Resources Defense Council ("NRDC") has striven to compel the EPA to fulfill its statutory mandate under the Clean Water Act ("CWA"). 33 U.S.C. §§ 1251–1386. Under the terms of the CWA, the EPA was required by September 15, 1976, to propose and publish standards for the amounts and kinds of wastes that could be disposed of by the oil and gas extraction industry into the nation's waterways.[1] When the EPA did not promulgate these standards by

---

1. The Administrator of the EPA is required to publish and supplement a "list of categories" for which new standards would be developed, 33 U.S.C. § 1316(b)(1)(A), and to propose and publish regulations for these new standards within one year of the category's publication. *Id.* at § 1316(b)(1)(B). The oil and gas industry was placed on the list of sources on September 15, 1975. *See* 40 Fed.Reg. 42,516 (Sept. 15, 1975). The EPA therefore was required to promulgate the standards by September 15, 1976.

1979, the NRDC filed the instant suit. A settlement agreement was reached in July 1980 whereby the EPA agreed to a schedule to issue the standards. *See* Settlement Agreement (approved July 9, 1980) ("1980 Settlement Agreement"). Under the 1980 Settlement Agreement, the EPA was to propose standards by November 30, 1981, or as soon after as possible. Final standards were to be promulgated within 60 days of the close of the public comment period, or else the EPA was to provide an alternative time by which the final standards were to appear. *See* 1980 Settlement Agreement at 5. The proposed regulations were not published until August 1985. *See* 50 Fed.Reg. 34,592 (Aug. 26, 1985). However, the EPA did not promulgate any final rules.

In September 1988, as no final regulations had ever been issued, NRDC moved to reopen the case. In March 1990, the parties presented this Court with a settlement agreement that established a new timetable for the proposal and promulgation of the regulations. The Settlement Agreement was approved by the Court on April 5, 1990 and incorporated into a Final Order and Decree, with the Court retaining jurisdiction. *See* Final Order and Decree.

The 1990 Settlement Agreement provides that the EPA shall promulgate effluent limitations based upon the application of Best Available Technology Economically Achievable (BAT) and Best Conventional Pollution Control Technology (BCT) for produced water,[2] drilling fluids,[3] drill cuttings,[4] well treatment fluids[5] and produced sand waste streams[6] for new sources in the offshore oil and gas extraction point

source category. *See* Settlement Agreement § I. The Settlement Agreement sets out a time schedule for the promulgation of the regulations. The EPA was to propose or repropose effluent limitations guidelines and standards by November 16, 1990, and to promulgate final effluent guidelines and standards by June 19, 1992. Settlement Agreement § I.A, I.B. Section II of the Settlement Agreement required the EPA to determine by November 16, 1990 whether to propose limitations guidelines and new source performance standards for "domestic and sanitary wastes and deck drainage waste streams." If the EPA determines that such regulations should be promulgated, it is required to promulgate final guidelines and standards by June 30, 1993. Settlement Agreement § II. The Settlement Agreement also provides that the parties are free to petition the Court for an interpretation or modification of the Agreement. *See* Settlement Agreement § V.

THE DECEMBER 1990 MOTION

On December 21, 1990, plaintiff NRDC moved to enforce this Court's April 5, 1990 Final Order and Decree and for an order to show cause as to why the defendant Administrator of the EPA should not be held in contempt for violating the decree. NRDC claims that the terms of the Settlement Agreement mandated that the EPA propose effluent limitations guidelines and standards for certain wastes produced by offshore oil and gas facilities by November 16, 1990 and that an "initial" proposal submitted on that date was an intentional circumvention of the "plain language and clear intent of the Court's decree." *See* Plaintiff's Motion to Enforce Consent De-

---

**2.** Produced water is water that is brought up from "the hydrocarbon-bearing strata with petroleum liquids and natural gas, that includes brine trapped with the oil and gas in the formation and water injected into the reservoir to increase productivity." *See* 55 Fed.Reg. 49,094, 49,096 (Nov. 26, 1990).

**3.** Drilling fluids are "suspensions of solids and dissolved materials in a base of water or oil that are used in rotary drilling operations to lubricate and cool the drill bit, carry cuttings from the hole to the surface and maintain hydrostatic pressure down hole." *See* 55 Fed.Reg. at 49,095.

**4.** Drill cuttings are particles cut from the formation in the well bore by the drill bit. *See* 55 Fed.Reg. at 49,095.

**5.** Well treatment fluids are used "down hole in drilling operations or during production." *See* 55 Fed.Reg. at 49,096.

**6.** Produced sand wastestreams include sand that comes to the surface. "The wastestream also includes sludge generated by any chemical polymers used in the filtration portion of the produced water treatment system." *See* 55 Fed.Reg. at 49,096.

cree, and For Order to Show Cause Why the Defendant Administrator of the Environmental Protection Agency Should Not Be Held in Contempt for Violating the Decree ("December 1990 Motion") at 1. Plaintiff points to the abbreviated nature of the initial proposal and to the fact that defendants allegedly contacted plaintiff a week prior to the November 16, 1990 deadline when defendants sought plaintiff's consent to an amendment of the decree which would have postponed the schedule. *See* Memorandum in Support of December 1990 Motion at 11. In response, defendants assert that the initial proposal, which was published in the *Federal Register* on November 26, 1990, fulfilled the terms of the Settlement Agreement. Further, defendants argue that since the EPA then published a proposed rule on February 28, 1991,[7] "NRDC's concerns have been fully addressed." EPA's Second Supplemental Memorandum in Opposition to December 1990 Motion at 1.

■ Contrary to defendants' assertion, this Court does not believe that the "initial proposal" of November 16 met the clear intent of the Settlement Agreement despite defendants' claim that it met the obligations of Paragraph I.A of the Settlement Agreement.

■ The interpretation of a consent degree is primarily a matter of contract law. *See United States v. Western Electric Co.*, 846 F.2d 1422, 1427 (D.C.Cir.1988). Generally, the scope of a consent decree "must be discerned within its four corners." *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). However, as with other contracts, reliance on aids to construction is proper, "including 'the circumstances surrounding the formation of the consent decree.'" *See United States v. Western Electric Co.*, 846 F.2d 1422, 1427 (D.C.Cir.1988) (*quoting United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975)). Decrees in which the government

is a party are treated as any other agreement, and there is "no doctrinal basis for the district court to defer to the [government's] interpretation of the decree or its views" about the issues. *United States v. Western Electric Co.*, 900 F.2d 283, 297 (D.C.Cir.1990). Therefore, we look to the language of the agreement and the contemporaneous understandings of its purposes. *See* 900 F.2d at 293.

Section I of the Settlement Agreement reads:

I. With respect to produced water, drilling fluids and drill cuttings, well treatment fluids and produced sand waste streams, as described at 50 *Fed. Reg.* 34,595 (August 26, 1985), the Administrator shall develop and promulgate regulations establishing and requiring achievement of effluent limitations guidelines based upon application of BAT and BCT, and standards of performance for new sources in the offshore subcategory of the oil and gas extraction point source category, according to the following schedule and requirements:

A. By November 16, 1990, EPA shall propose or repropose effluent limitations guidelines and standards.

B. By June 19, 1992, EPA shall promulgate final effluent limitations guidelines and standards.

The Settlement Agreement does not address in detail what type of proposal would satisfy § I.A. However, an understanding of the language used in the Settlement Agreement and the circumstances leading to its development indicates that the Agreement contemplates something more formal than the EPA's November 16, 1990 brief submission.

As outlined above, the Settlement Agreement was reached after years of EPA foot-dragging in its development of effluent guidelines for the oil and gas extraction industry. Given this background, we find it improbable that the EPA acted in complete good faith. The "initial proposal" published November 26, 1990 is a far cry

---

**7.** The proposed rule was published in the *Federal Register* on March 13, 1991. *See* 56 Fed.Reg. 10,664.

from the "Proposed Rule" published March 13, 1991. The former is three pages long and does not contain any of the detail of the 51 *Federal Register* pages of the latter proposal. 56 Fed.Reg. 10,664–715 (March 13, 1991). The initial proposal allowed for comment, but stated that interested parties could instead submit comments on a more detailed notice that would be issued by February 28, 1991. *See* 55 Fed.Reg. 49,094 (Nov. 26, 1990). There would be little reason to include a provision in a settlement agreement for a Proposed Rules deadline if it could be avoided by a statement that a more complete, detailed Proposal would follow whenever the agency thought appropriate. Additionally, the initial notice did not make available any Technical Development Document, but stated that the later proposal "will present technical, economic, environmental and other data relating to those options." 55 Fed.Reg. at 49,096.

Defendants argue that the NRDC is turning a question of deadlines into one of substantive adequacy. *See* Defendant's Opposition to December 1990 Motion at 2. We agree, but we note that certain terms of the agreement, while procedural in form, can have substantive import. Such is the case for imposing time frames for observance of rules and regulations. Publishing proposed rules is a standard step in the procedure leading to the promulgation of final rules.[8] It allows the public a chance to comment. It is our belief that using the term in the Settlement Agreement meant standard Proposed Rules—a proposal that would look much more like the March 1991 proposed rules than the initial proposal. Further, under the terms of the Settlement Agreement, the EPA was free to seek clarification or modification from the Court, a step that it chose not to take.

■ Although the November 19, 1990 submission by the defendants did not com-

ply with the mandate of Paragraph I.A of the Settlement Agreement, it is not necessary to address this aspect of plaintiff's complaint in any further detail. This is because the defendants' 51–page Notice filed and published on March 13, 1991 in the *Federal Register* was in substantial compliance. This matter is now moot as plaintiff recognizes "[w]ith respect to plaintiff's request for enforcement of the decree, there is no longer any need for the Court to mandate that the agency issue proposed rules by a date certain." Plaintiff's Response to EPA's Supplemental Memorandum in Opposition to December 1990 Motion at 2.

## THE APRIL 1991 MOTION

■ Plaintiff's Second Motion to Enforce Consent Decree, filed on April 22, 1991, concerns a challenge to defendants' failure to propose any effluent limitations for radium–226 and radium–228 in the water pollution regulations. For the reasons that follow, we deny the motion.

NRDC argues that the Settlement Agreement requires that the EPA promulgate standards for radium–226 and radium–228, that in the March 13, 1991 *Federal Register* Notice, EPA specifically identified those radioactive isotopes, and failed to include a proposal covering said hazardous by-products in its March 1991 Proposed Rule. Plaintiff argues that the language of the Settlement Agreement that directs the EPA to "propose or repropose effluent limitations guidelines and standards" for produced water thereby encompasses and requires the EPA to propose regulations for these radionuclides. Further, plaintiff argues that the fact that the Settlement Agreement specifically allows the EPA some leeway in the development of regulations for domestic and sanitary wastes and for deck drainage waste streams means

---

**8.** In a case before Judge Lamberth of this Court, the Director of the Office of Water Regulations and Standards at EPA explained the procedure prior to promulgating a proposed rule, although she noted that her declaration did not address the "schedule promulgation in November 1992 of new guidelines for the Offshore Oil and Gas Extraction industry." She stated that the Tech-

nical Development Document is made "available at the time of publication of the proposed guidelines in the *Federal Register* in order to promote more informed comment on the proposal." *See* Declaration of Martha G. Prothro ¶ 38, *Natural Resources Defense Council, Inc. v. Reilly,* Civ. No. 89–2980 (D.D.C. filed Jan. 25, 1991).

that these were the only wastes not subject to the "strict rulemaking schedule embodied in the Decree." *See* Plaintiff's Memorandum in Support of Its Second Motion to Enforce Consent Decree at 8.

The language of the Settlement Decree is not nearly so specific as to mandate the inclusion of a particular component in the regulations. While this Court has jurisdiction to enforce the Consent Decree and to hear claims that the Administrator has failed to fulfill a mandatory duty to promulgate regulations, it is not our domain to judge what should be included in the regulations. Our responsibility in this case does not extend beyond the terms of the Settlement Agreement and other congressionally-mandated deadlines. *See* 33 U.S.C. § 1365.

The fact that this Court does not have control over the substance of the EPA's rulemaking discretion does not mean that the EPA could merely promulgate regulations without real meaning and fulfill the terms of the Consent Decree. However, the EPA did discuss the pollutants. Lacking full knowledge, it understandably sought additional information from industry and others in the March 1991 proposed rules.[9] *See, e.g.,* 56 Fed.Reg. 10,664, 10,676–77 (March 13, 1991). Administrative rule making cannot be conducted in the absence of the facts.

The EPA's position is further supported by the terms of the Settlement Agreement itself. The Agreement explicitly permits the EPA to either propose new regulations or repropose its 1985 proposed rules. The 1985 proposed rules did not address the problem of radium–226 or radium–228. *See* Settlement Agreement I.A; 50 Fed. Reg. 34,592 (Aug. 26, 1985). To suggest that it is a breach of the Settlement Agreement not to include limits on radium–226 and radium–228 in the March 13, 1991. *Federal Register* Notice makes no sense in the absence of more information. For these reasons, we deny plaintiff's second motion to enforce consent decree.

Although we are denying plaintiff's motions, we believe that they are not completely without merit in that plaintiff's services will contribute to the more prompt and expeditious future observance by EPA of its obligations voluntarily assumed. Consequently, we will allow costs of these motions to be borne by the EPA. This Court firmly expects that the final regulations will be complete or that the parties will seek modification from this Court well prior to the June 19, 1992 deadline. Extensions will be granted most sparingly.

---

9. For example, the Proposed Rule states: "EPA intends to investigate the presence of radionuclides in produced water from facilities further offshore and the effects of radioactivity on the oceanic environment surrounding the platforms. Following receipt of any data as a result of today's notice and EPA's investigations, EPA intends to issue a Notice of Data Availability and will take all available information into account in developing final regulatory controls on produced water." 56 Fed.Reg. at 10,677.