**NEW YORK STATE ASSOCIATION FOR RETARDED CHILDREN, INC. et al., and Patricia Parisi et al., Plaintiffs,**

v.

**Hugh L. CAREY, Individually and as Governor of the State of New York et al., Defendants.**

Nos. 72 Civ. 356, 357.

United States District Court, E. D. New York.

Jan. 2, 1980.

New York Civil Liberties Union, Mental Health Law Project, New York City, for plaintiffs; Christopher A. Hansen, Robert Levy, New York City, of counsel, and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs; Jonathan D. Siegfried, Helen Hershkoff, New York City, of counsel.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for defendants; Taylor R. Briggs, Richard C. Cole, William B. Griffin, New York City, of counsel, and Robert S. Abrams, Atty. Gen. of the State of New York, New York City, for defendants; Robert S. Hammer, Asst. Atty. Gen., New York City, of counsel.

Jeffrey J. Sherrin, Margaret M. Corcoran, Albany, N. Y., of counsel, for New York State Office of Mental Retardation and Developmental Disabilities.

BARTELS, District Judge:

This is an application by plaintiffs on behalf of themselves and other members of the Willowbrook class [1] for an order imple-

---

1. This application is made by plaintiffs Lydia Daniels, Juan Gonzalez, Hector Ramos, and Mario Rivera, all members of the Willowbrook class. They are joined here by their parents,

menting and enforcing the Consent Judgment entered in this action on April 30, 1975. Specifically, they seek an order enjoining defendant New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD") and its officials from terminating funding for the placement of class members in the home of their natural parents. They base their application principally upon specific provisions of the Consent Judgment and at the same time contend that termination of the funding violates the New York State Administrative Procedure Act and the Equal Protection and Due Process Clauses of the United States Constitution.

Defendants oppose the application, asserting that disbursement of the funds in question is unauthorized, illegal, and unnecessary to assure proper implementation of the Consent Judgment. In substance, they argue that funding of natural home placement of Willowbrook class members and mentally retarded residents of New York state generally is a legislative measure which the state legislature has repeatedly rejected.

Upon consideration of the affidavits, depositions, and briefs submitted by the parties, and the testimony of Kathy Schwaninger, Executive Director of the Willowbrook Review Panel, and oral argument heard on December 7, 1979, the Court concludes for the reasons hereinafter set forth that plaintiffs' motion must be granted.

## I. BACKGROUND

The facts underlying the principal civil rights action previously brought on behalf of the residents of Willowbrook Developmental Center (now "Staten Island Developmental Center") have been stated in numerous prior decisions of this Court,[2] and

they need no repetition here. The major points of contention were settled in 1975 by the Willowbrook Consent Judgment, which has since been modified by order of the Court on March 10, 1977 and September 15, 1978. The essence of the Consent Judgment is its mandate that defendants provide Willowbrook residents with the "least restrictive and most normal living conditions possible . . . ," Consent Judgment, § A(1), and to that end, defendants are required to "take all steps necessary to develop and operate a broad range of non-institutional community facilities and programs to meet the needs of Willowbrook's residents and the class." Id., § V(1). Included in these necessary steps is defendants' responsibility each year to request the New York legislature to "appropriate sufficient additional funds for the development and operation of community facilities and programs to serve the needs of the class . . . ." Id., § V(2); see also id., ¶ 3. Within six months after the date of the Judgment, defendants were required to place 200 Willowbrook residents in the community, id., § V(4), toward the Judgment's ultimate goal of deinstitutionalization by reducing the institution's population from approximately 2800 in 1975 to 250 by 1981. Id., § V(1).

In order to implement these provisions, defendants began in 1975 to develop a placement program offering a broad spectrum of services and community settings, ranging from group homes to individual placements within a family home. As the placement process is currently in effect, the crucial determination as to the most appropriate placement, i. e., "the least restrictive and most normal living conditions possible," for each individual class member is made by an Interdisciplinary Treatment Team[3] af-

Ann Boston Daniels, Ada Gonzalez, Maria Silva, and Anna Maria Scarborough, who want to care for their children at home but are unable to do so for financial reasons.

2. Prior reported decisions in this case appear at 357 F.Supp. 752 (E.D.N.Y.1973); 393 F.Supp. 715 (E.D.N.Y.1975); 409 F.Supp. 606 (E.D.N.Y. 1976); 438 F.Supp. 440 (E.D.N.Y.1977); 456 F.Supp. 85 (E.D.N.Y.1978); 466 F.Supp. 479

(E.D.N.Y.1978); 466 F.Supp. 487 (E.D.N.Y.), aff'd, 612 F.2d 644 (2d Cir. 1979); see also 596 F.2d 27 (2d Cir. 1979), cert. denied, 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979).

3. Although there is no standard composition of an Interdisciplinary Treatment Team, it consists generally of those persons working with a particular client and may include his or her direct care staff, teacher, therapist, and any

ter careful evaluation of both the client and his or her program, as prepared by direct care staff personnel. Once a placement recommendation is made, parents of the client affected are consulted, and if they object to the proposal, due process procedures may be invoked.

Pursuant to the community placement mandate of the Consent Judgment, placements of class members in foster homes under the Family Care Program have been made in numerous cases since 1975. Established prior to approval of the Consent Judgment for the benefit of those persons "who do not require inpatient care in an institution but who are unable to function adequately in their own homes or in independent housing accommodations," N.Y. Soc.Serv.L. § 209(3)(c) (McKinney), the Family Care Program provides for income maintenance payments to clients for their "lodging, board and minimal personal attendant services . . ." *Id.* The purpose of the program is to provide a stable family living arrangement where clients can, through supervision and participation in household activities, enhance developmental abilities and independent living skills. OMRDD Policy Manual § 10. Funding comes from a complex joint federal-state scheme and consists of federal Supplementary Security Income ("SSI") payments and additional state payments established under New York law in order to bring the total payment up to a statutorily determined "standard of monthly need." *Id.*, § 209(2) (McKinney Supp. 1979).[4] In order to qualify under the program, various financial and categorical eligibility requirements must be met,[5] and the foster parents must be certified by OMRDD as "family care providers."[6] Notwithstanding satis-

other persons whose participation is relevant to identifying the needs of the individual. To this core group may be added such other specialists as are needed in order to accomplish an adequate evaluation and program plan for the client. The process and procedure by which an Interdisciplinary Treatment Team is organized may differ from setting to setting, but its primary goal is to develop a unified and integrated individual evaluation and program and then to implement that program. Periodically, team members must review the adequacy of the client's progress, reevaluate the needs and appropriateness of the program, and modify the objectives and/or program accordingly. *See generally* the Willowbrook Review Panel's *Auditor's Manual*, at 1–8.

**4.** Briefly stated, the funds made available to a client under the Family Care Program and eventually paid to the family care provider are composed of two parts. The first is a federal Supplemental Security Income ("SSI") benefit paid by the United States Department of Health, Education and Welfare pursuant to Title XVI of the Federal Social Security Act, 42 U.S.C. §§ 1381 *et seq.* The second portion is an "additional state payment" made pursuant to N.Y.Soc.Serv.L. § 209 (McKinney), which is intended to bring the SSI payments up to the following "standard of monthly need": $334.46 if the client lives in New York City, and $296.46 if he or she resides outside New York.

**5.** The eligibility requirements for SSI and for additional state payments are substantially similar. The principal categorical requirement is that the recipient be over 65 years of age, blind, or disabled, as specifically defined under both programs. The financial need criterion under each program provides that a recipient not have an income or resources above a certain level, *see* 42 U.S.C. § 1382 and N.Y.Soc. Serv.L. § 209.2 (McKinney Supp.1979), and the income and resources of a child living with his natural parents are deemed to include the income and resources of the parent. 42 U.S.C. § 1382c(f)(2). In order to be eligible for additional state payments, a client's countable income and resources must be such as would entitle him or her to SSI benefits. N.Y.Soc. Serv.L. § 209.1(a)(iii).

**6.** A family care provider is an adult of either sex, married, single or widowed, who is certified by the State Office of Mental Retardation and Developmental Disabilities ("OMRDD") pursuant to 14 N.Y.C.R.R. 87. The provider generally acts as a surrogate parent or family for the client, receives payment for the provision of food, clothing, and shelter to the client, and assists in skill development in conjunction with the client's development plan.

The certification process under the Family Care Program consists in part of an intensive investigation into the proposed family care provider and family care home. Its elements are set forth in detail in Item 10.3 of the State Department of Mental Hygiene's *Policies and Procedures for Family Care*, promulgated pursuant to N.Y.Ment.Hyg.L. §§ 31.04 *et seq.* In addition to health, safety, and programming inspections of the home, the proposed provider must agree, *inter alia*, to participate with the client's Interdisciplinary Treatment Team, undergo special training, attend case management

faction of each of these requirements, no class member can be placed in a foster home without an Interdisciplinary Treatment Team first having determined that such placement is the most appropriate.

Defendants assert that from its inception, the Family Care Program has been directed to placement of retarded persons in foster homes, rather than natural homes, and they rely upon the principle that a parent has legal, and thus financial, responsibility for a natural child until the age of majority. *See* N.Y.Dom.Rel.L. § 32. On June 28, 1975, however, the State Department of Mental Hygiene issued a departmental Memorandum extending availability of family care benefits to natural parents of retarded adults who have been institutionalized for at least two years in any institution in the state of New York. This interpretation of the applicable regulations was predicated upon the view that upon achieving majority a child is no longer the natural charge of the parents.

In October 1975, defendants determined that in order to meet the placement goals of the Consent Judgment within the required time frame, additional proposals for immediate community placement of Willowbrook residents were necessary. As a result, on December 5, 1975, then-Deputy Commissioner for Mental Retardation Thomas Coughlin issued Mental Retardation Memorandum No. 75–37, which stated, in part, as follows:

> In view of the Consent Judgment ordering the Department to reduce the population of Willowbrook Developmental Center from 2,800 residents to 250 by 1982; and because of the benefit to children which would occur from their early reintegration into their own homes, the Division of Mental Retardation will allow the placement of minor children of the Willowbrook class into their own homes under the family care program as an *emergency measure.* Children placed must be of an age and status that will allow them to be eligible for regular family care payments when they reach the age of 18. All family care regulations will be followed. (Emphasis added.)

Payments to natural parents under this emergency program were to be made in amounts equal to those received by foster parents under the statutory Family Care Program. Although this Memorandum referred specifically to that program, it is apparent that the action taken was based not on the family care statutes but on the Consent Judgment because funding was to be drawn solely from the Willowbrook Developmental Center "other than personal services" budget. Statutory family care funding was unavailable because children placed in their natural homes are deemed to receive the income of their parents and, thus, were generally not income eligible under the statutes. The relevance, therefore, of the statutory Family Care Program was solely as a procedural framework for the emergency program. Of the approximately 500 families eligible to take advantage of this program for natural home placement of children residing at Willowbrook, only 20 expressed an interest in participating.[7]

Due largely to its limited impact, this "emergency measure" continued relatively unnoticed until early 1979. On March 21, however, in *Sundheimer v. Kolb*, N.Y.L.J. at 1 (Sup.Ct.Bronx Co. March 22, 1979), the New York State Supreme Court found the application of the statutory Family Care Program through the Memoranda cited *supra* to be "laden with unconstitutional defects."[8] Although the court concluded that

---

visits, and provide the client with such special services as special diets, supplemental education, psychological consultations, and integration of daily activities with programming designed by the Interdisciplinary Treatment Team.

**7.** As of the date of this application, the number of natural family placements funded under the

program had grown to 83, of which 23 were children from Willowbrook and 50 were adults.

**8.** In connection with the *Sundheimer* litigation, former OMRDD Commissioner Coughlin submitted an affidavit, dated November 1, 1978, describing the existing application of the Family Care Program to natural parents:

the statutes themselves were properly drafted, it held that the extension of family care benefits by OMRDD to children placed in the natural home only (1) if a member of the Willowbrook class, or (2) if an adult and previously institutionalized for two years, effectively penalized the *Sundheimer* class —"those parents who chose not to submit their children to the well-documented horrors of [the Willowbrook] institution"—for caring for their children at home and violated their rights under the Equal Protection Clause of the Fourteenth Amendment. Specifically, the court found that the parents and children affected were identical except for the fact that "one group of children and adults has been institutionalized while the other has not," and it stated that "[b]y and large, the plaintiffs and the class which they seek to represent, have been denied unfairly certain benefits and categorized without rational basis to their detriment."

According to former OMRDD Commissioner Coughlin, the *Sundheimer* decision presented him with a dilemma: either (1) extend family care benefits to all natural parents of retarded children, regardless of whether a member of the Willowbrook class or extent of prior institutionalization, at an estimated cost approximating the total budget of OMRDD,[9] or (2) terminate the funding of all natural home placements. On May 17, 1979, the Commissioner opted for the latter course and issued the following memorandum to all OMRDD associate commissioners:

> Effective immediately and without any exceptions, there will be no further admissions to family care in the natural home for both children and adults. Each facility director within your county service group should be called *personally* by you to be informed of this directive immediately. This is the highest priority and I would like you to call me when you have called each of the facility directors.

. The decision evidenced by the above memorandum is the basis for plaintiffs' present application. On September 4, 1979, they moved for a preliminary injunction against defendants' refusal to certify natural parents of Willowbrook class members as Family Care Providers for their own children and defendants' denial of benefits to natural parents under the program. After limited discovery and several hearings before the Court in connection with discovery requests, plaintiffs modified the application to seek an order implementing and

[T]here are two narrow exceptions to the policy against placing a client in Family Care in his/her own home. The first exception is for clients over 21 years of age who have been in residence in a Department of Mental Hygiene facility for two years or more, when the clients Interdisciplinary Team recommends such placement and the home of the client's parents and or relatives meets the standards required for Family Care. Item No. 10.2.2 of Mental Retardation policy chapter on Family Care. These clients are given priority for participation in the Family Care Program because, due to their extended institutionalization, they have more difficulty adjusting to community living, and thus are in special need of the skills which the Family Care Program provides. In this situation, Family Care with the client's parents as providers is the only alternative for releasing the client from the restrictive environment of the Developmental Center to begin the training necessary for the integration back into community life.

The second exception to the policy against placing clients in Family Care in their own homes is for Willowbrook residents under the age of 21. Although the goals of the Family Care Program may not be obtainable in this situation, the need for moving children out of Willowbrook as quickly as possible has made it necessary to place these children in their own parents' home until more suitable living arrangements can be made available.

9. At oral argument, defendants estimated that extension of benefits to all natural parents of retarded children would cost between $100 million and $400 million annually. Plaintiffs dispute the accuracy of this prediction, however, in view of the limited number of families which have taken advantage of the program during the period preceding the decision in *Sundheimer v. Kolb*, N.Y.L.J. at 1 (Sup.Ct. Bronx Co. March 22, 1979) and because of their contention, explained in the testimony of Executive Director of the Willowbrook Review Panel Kathy Schwaninger, that natural home placement is significantly less expensive than maintenance of a client in a state institution. *See* note 20 and accompanying text *infra*.

enforcing compliance with the Consent Judgment, abandoning thereby any claim to funding under the statutory family care program.

Thus, it is this modified application that is now before the Court for decision, rather than the motion for a preliminary injunction. Jurisdiction over the subject matter of the controversy exists under ¶ 9 of the Consent Judgment, which provides that the retained jurisdiction of the Court shall include authority to make further orders "as may be necessary or appropriate for the construction of, implementation of, or enforcement of compliance with this judgment or any of the provisions thereof."

It is conceded by all parties that former OMRDD Commissioner Coughlin's characterization of funding for natural home placement of Willowbrook class members as being made "under the family care program" was erroneous and misleading. In an affidavit to the Court dated October 23, 1979, Commissioner Coughlin described the natural home placement program for Willowbrook class members as offering a "subsidy to parents of class members who take their children back home in a program *similar* to family care." (Emphasis added.) Thus, he at no time understood or intended that such funding for children residing at Willowbrook would come within the ambit of the family care statutes. Indeed, as stated *supra*, funding came not from state or federal social services coffers but from the Willowbrook Developmental Center budget. Although the certification process and the amounts received by the parents were similar under both programs, the sources of funds and the eligibility requirements were entirely unrelated.

Consequently, the statutory Family Care Program is at best only tangentially rele-

vant to this application as background on the origins of the dispute. Any general claim of entitlement which plaintiffs have previously asserted under the additional state payments program of the N.Y.Soc. Serv.L. must be denied because of their failure to demonstrate either categorical or financial eligibility for the benefits thereunder. Plaintiffs' claims, if upheld, must be predicated upon the Consent Judgment or some constitutional basis.

It is apparently also undisputed that with respect to some class members, the "least restrictive and most normal living conditions possible" have been determined to be their natural home. Kathy Schwaninger, called by the Court as an expert witness, testified that an Interdisciplinary Treatment Team may determine after careful deliberation that placement of a particular client with his or her natural parents will ensure the greatest degree of personal development because the client may respond to the warmth of a natural parent in a way which could not occur in a foster or group home.[10] This testimony was consistent with that of OMRDD Director of Community Placement for the New York City/County Services Group Dorothy Rowe, who confirmed at deposition that as to some clients the natural home had been determined to be the least restrictive environment. She indicated also that denial of funds to natural parents now will in some instances result in class members not being placed in their natural homes, even though one year earlier such a placement would have been made. The issue before the Court, therefore, is not whether natural home placement may be appropriate for a particular client, but whether defendants are required, not by any statute, but by the Consent Judgment, to fund such placement. It is to this issue that we now turn.

10. Kathy Schwaninger cited an example of the benefit which may result from the special relationship between a parent and his or her natural child:

[T]here would also be some very strong positives. A good example that comes to mind . . . parents who have maintained contact with their children over time. They have a very strong emotionally warm, supportive

relationship. When they work with their particular child, the child or adult is very responsive and will try to do skills, try to acquire skills.
In contrast, that same individual class member might be totally unresponsive to doing that kind of thing ˙ . . to a stranger, sure, that's a possibility.
*Tr.*, Dec. 7, 1979, at 92.

## II. *CONTENTIONS OF THE PARTIES*

In essence, plaintiffs contend that defendants' termination of funding of natural home placements violates two basic provisions of the Consent Judgment: first, the requirement in § A(1) that class members be provided with the "least restrictive and most normal living conditions possible," and second, the mandate in § V(1) that the population of Willowbrook Developmental Center be reduced to 250 or fewer by 1981. As to the first provision, they argue that (i) there are presently class members who have been evaluated as requiring placement in the natural home as the least restrictive environment, (ii) the natural parents of these class members are interested and willing to care for their children at home, (iii) these parents would be able to provide adequate in-home care if they were certified and funded at the rate set under the statutory Family Care Program, and (iv) the existing inappropriate living conditions of these clients threatens them with irreparable harm in the form of developmental regression. As to the second provision, plaintiffs assert defendants are required to move approximately 1600 clients out of Willowbrook in the next eighteen months and that denial to them of natural home placement will hinder and delay attainment of that goal.

In opposition, defendants argue first that New York law does not now, nor has it in the past, authorized cash payments to natural parents, without regard to need, for in-home care of their mentally retarded children. They cite repeated rejections by the New York state legislature of attempts by statute to provide reimbursement for natural home placement as conclusive evidence that such funding by OMRDD is not only unauthorized but illegal under New York law.[11] Moreover, they dispute plaintiffs' contention that the drafters of the Consent Judgment contemplated natural home placements, asserting that the phrase "least restrictive and most normal living conditions possible" applies only to residents living at Willowbrook and that the community placement provisions of § V contain no reference to natural home placement.[12]

Defendants further contend that fundamental changes in OMRDD's placement program since the "emergency measure" was instituted in 1975 have made its continuation unnecessary. Citing creation of Borough Developmental Services Offices ("BDSO") and the New York City/County Services Group designed to support the provision of community services and integrate the retarded into the community, they argue that OMRDD is now able to provide a broad range of residential placements enabling individual clients to progress along a continuum of services to address their developing skills.[13] This expanding capability,

---

**11.** According to a letter from defendants' counsel to the Court, several bills were introduced in 1977 and 1978 in the New York state legislature which would have provided reimbursement of expenses to parents for in-home care of their retarded children. None of these bills was reported out of committee. During the 1979 session, Senate bills 586 and 1676, among others, sought to authorize funding in one form or another for natural home placement, but again neither was reported from committee.

**12.** Section V of the Consent Judgment pertains specifically to community placement, which is defined in subsection 4 as:

a non-institutional residence in the community in a hostel, halfway house, group home, foster care home, or similar residential facility of fifteen or fewer beds for mildly retarded adults, and ten or fewer beds for all others, coupled with a program element adequate to meet the resident's individual needs.

Subsection 6 gives the Willowbrook Review Panel broad authority, however, to "prepare and recommend for implementation by defendants a detailed and comprehensive plan for the development and operation of additional community facilities and programs to meet the needs of Willowbrook's residents and of the class. Said plan will be referred to hereafter as the 'community placement plan.' " For further discussion of this plan, *see* discussion *infra* at 1106–1107.

**13.** Defendants state that, although at the time former Commissioner Coughlin instituted the natural home placement program only family care and community residences existed as placement options, OMRDD is now capable of providing a range of residential placements, including "small independent apartment settings, congregate care, small intermediate care facilities for the mentally retarded, and alternative program models, the most significant being

together with the various federal programs under which plaintiffs can receive assistance,[14] have, according to defendants, supplanted the natural home placement program in issue here.

Finally, defendants cite the decision in *Sundheimer v. Kolb, supra,* as imposing upon them a financial obligation of potentially enormous proportions if this Court were to grant plaintiffs the relief requested. As interpreted by defendants, *Sundheimer* would require the provision of similar financial assistance to all of the estimated 55,900 retarded persons in New York state who presently live with their natural parents. Because this obligation would total more than $200 million annually, defendants urge that practical and equitable considerations require that plaintiffs' application be denied.[15]

### III.  *DISCUSSION*

■ It is true that natural home placement of Willowbrook class members is not explicitly authorized by the Consent Judgment. Indeed, if strictly construed, the definition of "community placement" set forth in § V(4) of the Judgment, authorizing noninstitutional residential facilities of "fifteen or fewer beds for mildly retarded adults, and ten or fewer beds for all others," would seem to permit placement in relatively large scale residences on an equal basis with smaller residences.

This provision must be considered in the context of the Judgment as a whole, however. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); *New York State Association for Retarded Children, Inc. v. Carey,* 596 F.2d 27, 37 (2d Cir. 1979), *cert. denied,* 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979).[16] Section A(2) evidences the drafters' general intent that residents progress from dependence and institutionalization to an individualized, independent existence, providing:

> [T]he staff shall prepare residents to move from 1) more to less structured living; 2) larger to smaller facilities; 3) larger to smaller living units; 4) group to individual residences; 5) segregated from the community to integrated with the community living and programming; 6) dependent to independent living.

Subsection (6) of § V amplifies this provision and requires that within six months of the date of the Judgment the Willowbrook Review Panel prepare a "detailed and comprehensive plan for the development and operation of additional community placement facilities and programs  . . ." Pursuant to this provision, in August 1976 the Review Panel issued a community placement plan, which was accepted by all parties to this action, and Deputy Commissioner Coughlin assumed responsibility for its implementation. As appears throughout

---

the day care program." Defendants' Brief, at 12.

**14.** Defendants challenge plaintiffs' claim of irreparable harm, citing various federal and state funds and services for which they might be eligible *without being certified for family care* funds. Among the programs are SSI, additional state payments, medical assistance subsidies, and food stamps. In addition, a variety of *support services designed to assist clients in* the community are available to all class members, regardless of whether they have been placed in the natural home. These include educational and guidance services, vocational rehabilitation programs, homemaker services, respite care, transportation, travel training, day program services, health services, and recreation and sheltered employment programs. These and other services are coordinated by the case managers of the Borough Developmental

Services Offices, who are also responsible for working with parents in training them to deal with their developmentally disabled children.

**15.** *See* note 9 *supra.*

**16.** Available aids to construction of a consent decree or order were discussed in *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975), where the Court stated:

> Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any documents expressly incorporated in the decree.

the plan, the importance of the natural home as not only a placement option but a placement goal is repeatedly emphasized:

> One of the most basic of all rights is that of children having the right to live with their own families. The importance of living with one's own family is well documented in the literature and protected by statutes and courts throughout the nation.

> The protection of this right so well afforded to "normal children" has not been equally applied to the mentally retarded.

\* \* \* \* \* \*

> An underlying assumption of the Community Placement Plan is that whenever possible and appropriate the placement site choice is within the natural family. Likewise, when support services are required by mentally retarded persons and/or their families, the intention for the provision of these services is that of maintaining the individual within his or her own natural home.

\* \* \* \* \* \*

> The outstanding benefit of the natural home support program, of course, is the potential for it providing the most normalizing environment for children and young adults. With appropriate support, this should allow for maximal growth and

independence of mentally retarded clients within the constellation of their own family. (*Community Placement Plan*, at 109–12.)

> [T]here must be a concerted effort by residential systems personnel to prevent removal of a person from his/her natural home. If the person has already left the home, as in the case of the Willowbrook Class, every effort must be made first to attempt to return those people to their homes, providing the necessary support as is needed.

\* \* \* \* \* \*

> This then constitutes the goal for the residential service system—to return clients to their natural homes and communities, and to insure movement of mentally retarded citizens to the most normal, least restrictive point on the living continuum. (*Id.* at 4–5.) [17]

The importance of the Review Panel in the implementation and interpretation of the Consent Judgment has been previously recognized, and its findings and recommendations concerning community placement, issued in the year following adoption of the Consent Judgment, are entitled to great weight in determining the intended scope of the placement program. *New York State Association for Retarded Children, Inc. v. Carey, supra.* [18]

---

[17]. With respect to financing the placement of class members in the natural home, the Willowbrook Review Panel in its Community Placement Plan stated:

> The actual amount of staff and financial resources directed toward a natural family placement will obviously vary from situation to situation; however, it is anticipated that the average cost of the natural home support program will be on par or below those costs incurred in foster home or group home settings. Additionally, considerable savings in time and effort by Borough Office staff can be anticipated as problems of homefinding, zoning, licensing and strict adherence to code requirements will not exist where natural families provide placement.

> The outstanding benefit of the natural home support program, of course, is the potential for it providing the most normalizing environment for children and young adults. With appropriate support, this should allow for maximum growth and independence of

mentally retarded clients within the constellation of their own family.
*Community Placement Plan*, at 112.

[18]. Although stated in the context of review of a formal Willowbrook Review Panel recommendation, the Second Circuit Court of Appeals' description of the Panel's authority in *New York State Association for Retarded Children, Inc. v. Carey*, 596 F.2d 27, 38 (2d Cir. 1979), is notable here as well:

> [W]e treat the organizational structure established under the Consent Judgment—à Review Panel with the power to recommend interpretations of the judgment and methods of implementing it—as analogous to the powers granted, say, to Congress under Section 5 of the Fourteenth Amendment to effectuate the matters of substance and procedure contained in the first four sections of that amendment.

The Panel's conception of community placement is supported by other indications as well. Most notably, former Commissioner Coughlin's extension of family care benefits to children residing at Willowbrook for placement with their natural parents reflects an apparent understanding that such placements were not only permitted by the Judgment, but were "necessary" and would "benefit . . . the children . . . [by] early reintegration into their own homes . . ." *See supra* at 7 and n. 8. Although he viewed state funding of this program as only an "emergency measure," his action suggests that community placement under the Consent Judgment was not interpreted as excluding the natural home. Thus, for the foregoing reasons, the Court must reject defendants' restrictive view of community placement.

Nor does the Court believe that there is any basis to construe the crucial language "least restrictive and most normal living conditions possible," found in § A(1) of the Judgment, as applying solely to residence at Willowbrook. As even defendants have conceded, obtaining such conditions for each class member is obviously the thrust of the Consent Judgment regardless of the setting in which they are provided, and it would be anomalous, indeed, to apply a lesser standard of responsibility with respect to living environment in the community than is applied to the Developmental Center. Again, the community placement plan prepared by the Review Panel is relevant:

> The principles upon which this Plan is based are a direct reflection of the Consent Judgment. Implicit in the agreement and explicit in Appendix A of the Consent Judgment is the necessity for developing *comprehensive* community mental retardation services which will guarantee the fullest protection of constitutional rights and habilitative opportunities for all residents of Willowbrook and

the total Class. It is mandated by the Decree that "residents shall be provided with the least restrictive and most normal living conditions possible . . ." *Community Placement Plan*, at 2. Defendants' obligation to protect and assist the members of the Willowbrook class does not end when the clients leave the Developmental Center grounds; in fact, section V(13) of the Judgment prohibits the community placement of any resident unless the Director of Willowbrook finds that "such placement will offer the individual better services . . . and a more suitable living environment . . ." Thus, it is incumbent upon defendants to insure that class members are placed "in the least restrictive and most normal living conditions possible."

Although this conclusion is reached strictly as a matter of construction of the language of the Consent Judgment, the recent *en banc* decision of the Court of Appeals for the Third Circuit in *Haldermann, et al. v. Pennhurst State School & Hospital, et al.*, 612 F.2d 84 (3d Cir. 1979), is instructive. Based upon detailed analysis of the statutory language and legislative history, the court held that the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6001–6081 (1976), provides to mentally retarded persons the right to the least restrictive environment. *Id.* at 103–108.[19] That this right is not limited solely to the provision of care within the institution is obvious from the language of the court's decision:

> For some patients, to be sure, the Act contemplates that institutionalization might be appropriate once adequate habilitation and living conditions are established. The clear preference of the Act, however, is deinstitutionalization, and . . . , we have no doubt about Congressional power to impose the least restrictive alternative requirement upon

---

**19.** Among the statutory provisions cited by the court in *Haldermann, et al. v. Pennhurst State School & Hospital, et al.*, 612 F.2d 84 (3d Cir. 1979), was 42 U.S.C. § 6010(2), which provides:

> The treatment, services, and habilitation for a person with developmental disabilities

should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive to the person's personal liberty.

the states for patients who do not require institutionalization for adequate habilitation.

*Id.*, at 107.

Defendants rely heavily upon the repeated rejection of natural home placement legislation in the New York state legislature. Although this may be persuasive evidence of that forum's intention not to undercut the legal obligation of natural parents to support their children, *see* N.Y.Dom. Rel.L. § 32, neither that legislative history nor the language of the existing family care statutes reflect a legislative intent to preclude defendants from entering into an agreement to fund natural home placement of a limited number of specified persons, such as the Willowbrook class members, whose constitutional rights defendants have violated. No explicit statutory or constitutional provision exists rendering such an agreement unlawful or against public policy, and this Court finds no basis to infer that such a prohibition exists. Nor do we believe that the disbursal of funds for natural home placement to a limited number of class members pursuant to the Consent Judgment agreed to by defendants is either unauthorized or illegal. Such a conclusion does not undercut the validity of a parent's general obligation to provide for his or her minor child under § 32 of the N.Y.Dom. Rel.L. because the natural home placement here involved has been funded out of the Willowbrook budget, which is itself the result of a legislative and executive appropriation. This analysis is in accord with ¶ 3 of the Judgment which requires that defendants "take all steps necessary to ensure full and timely financing of this Judgment, including, if necessary, submission of appropriate budget requests to the legislature." Having previously entered into the Consent Judgment, defendants cannot now assert lack of authorization as an excuse for failure to fulfill their obligations thereunder.

The Court cannot accept defendants' contention that under the *Sundheimer* decision they will be subjected to an immense financial burden if plaintiffs' application here is granted. On the contrary, such a decision by this Court is strictly limited in its effect to the members of the Willowbrook class, and the financial consequences therefrom would be minor in comparison to the calculations submitted by defendants predicated upon statewide liability under the family care statutes. In addition, all previous indications suggest that interest and desire to participate in natural home placement will be minimal, particularly if the option is provided only to clients for whom the natural home has been designated as the least restrictive environment and whose parents have been certified as family care providers. As a matter of principle, however, the financial consequences of natural home placement must be subordinate to the primary objective of providing services to which the Willowbrook class members are entitled. *See Welsch v. Likins*, 550 F.2d 1122, 1132 (8th Cir. 1977). Only when the financial burden upon the state becomes prohibitive or clearly inequitable should this Court stay its hand.[20]

Because defendants' obligation in this case is derived not from provisions of state or federal law but from the language of the Consent Judgment and extends only to the beneficiaries of that Judgment, this Court believes that the decision in *Sundheimer*, based as it is upon the family care statutes, is not applicable. In contrast to that case, the present application involves neither interpretation of the family care statutes nor any distinction based upon extent of prior institutionalization. Insofar as the *Sundheimer* court placed all retarded residents of New York state in the same category as Willowbrook class members, we disagree. Defendants' obligations under the Consent Judgment provide an eminently reasonable

---

**20.** Such is not the case here. Ms. Schwaninger estimated the annual cost of institutionalization as approximately $30,000 per person, of group home maintenance as between $9,000 and $12,000 per person, and of natural home placement as approximately $3,600 per person. *Tr.*, Dec. 7, 1979, at 89–90. Counsel for defendants did not question her figures and admitted that "it does cost less . . . .," and "no doubt would be cheaper, . . . especially cheaper than the cost of the institution." *Id.* at 103–04.

basis upon which to distinguish between class members and those retarded persons outside the Judgment's protection.

 We conclude, therefore, and it is hereby ordered that once it is determined in the normal course of the placement process under the Consent Judgment that a Willowbrook class member should be placed in the home of his or her natural parents in order to provide the "least restrictive and most normal living conditions possible," defendants are then enjoined from refusing (1) to certify the natural parents of that class member as family care providers and (2) to provide the funding reasonably necessary to effectuate such placement consistent with the standards applicable to natural and foster home placements previously made by defendants. Because of our interpretation of the Consent Judgment, it is unnecessary for us to reach any of the other issues raised by plaintiffs' application.

So ordered.