[Cite as *State ex rel. DeWine v. ARCO Recycling, Inc.*, 2022-Ohio-1758.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,
EX REL. MIKE DEWINE,                    :

      Plaintiff-Appellee,          :

                                   :          No. 110703

      v.                           :

ARCO RECYCLING, INC., ET AL.,           :

      Defendants-Appellants.       :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 26, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV- 17-881301

---

### *Appearances:*

Dave Yost, Ohio Attorney General, and Pearl M. Chin, Sarah Bloom Anderson, and Matthew E. Meyer, Assistant Attorneys General, *for appellee.*

Deborah L. Mack, *for appellants.*

CORNELIUS J. O'SULLIVAN, JR., J.:

{¶ 1} Defendants-appellants George Michael Riley ("Riley")[1] and Residential Commercial Industrial Services, LLC (individually, "RCI" and collectively, "appellants") appeal from the trial court's June 29, 2021 judgment against them, which was rendered after a bench trial. After a thorough review of the facts and law, we affirm.

**Background and Procedural History**

{¶ 2} The record demonstrates that Defendants ARCO Recycling, Inc. ("ARCO"), 1705 Noble Road Properties, LLC ("1705 Noble Road Properties"), Christina Beynon ("Beynon"), and Riley owned and/or operated a construction and demolition debris facility at 1705 Noble Road, East Cleveland, Ohio ("the site").

{¶ 3} In June 2017, plaintiff-appellee the state of Ohio filed a complaint against the above-mentioned defendants for violations of Ohio's construction and demolition debris laws as enacted in R.C. Chapter 3714.

{¶ 4} In June 2017, after the suit was filed, defendants ARCO, 1705 Noble Road Properties, and Beynon entered into a partial consent order. The partial consent order required ARCO, Beynon, and 1705 Noble Road Properties to, among other things: (1) comply with R.C. Chapter 3714 and the rules thereunder, (2) relinquish their rights in all construction and demolition debris located at the site, (3) allow the Ohio Environmental Protection Agency ("Ohio EPA") and the

---

[1] Riley is also known as Anthony Michael Castello.

Cuyahoga County Board of Health ("board of health") full access to the site for the purpose of debris removal, and (4) repay the state for all funds expended for clean-up of the site. Appellant Riley was not a party to the partial consent order.

{¶ 5} In March 2019, the state filed a first amended complaint to add appellant RCI as a defendant and to include allegations for violations of Ohio's construction and demolition debris laws committed by appellants.

{¶ 6} On April 15, 2019, Riley, as sole owner and operator of RCI, accepted service on RCI's behalf. RCI failed to answer or otherwise respond to the state's amended complaint, and in June 2019, the state filed a motion for default judgment against RCI. On January 8, 2020, the trial court granted the state's motion for default judgment as it related to RCI's liability; it reserved its ruling on RCI's civil penalty for trial.

**Discovery**

{¶ 7} In June 2018, the state served Riley with its first set of discovery requests. In the requests, the state asked Riley, among other things, to identify every person he intended to call as an expert or lay witness and to provide any reports or documents prepared by or received by his expert witness. Riley responded to the state's requests, but objected to the above-mentioned request and responded that the requested information "will be provided in accordance with the court's pretrial order."

{¶ 8} The state also asked Riley to confirm whether he intended to claim financial inability to pay the penalties. Riley replied that he was unable to evaluate

an inability to pay, but "[i]f Mr. Riley presents evidence of inability to pay, all documents * * * related to his financial condition will be made available for review."

{¶ 9} The trial court ordered that discovery was to be completed by May 31, 2019. In April 2019, the state provided its initial witness list to appellants. According to an affidavit of the state's lead counsel in the matter, the state made several attempts to obtain a list of Riley's intended witnesses, to confirm whether he was asserting financial inability to pay, and if so, to obtain the relevant supporting documents. In response to the state's inquiry, in early May 2019, Riley told the state's counsel that he would provide a witness list by May 13, 2019. Riley did not provide a witness list by that date, however. Instead, Riley informed the state's counsel that he would not be calling any fact or expert witnesses at trial and that he would not be deposing any Ohio EPA employees or other state witnesses. Riley also did not provide the state with any documentation as to his inability to pay penalties.

{¶ 10} The trial court's discovery orders contained the following or substantially similar language:

> Parties are to abide by the standing orders of the court located on the court's website. Failure to comply with the court's order may result in sanctions including but not limited to prohibiting the introduction of evidence at trial, limiting or dismissal of claims and/or defenses, granting of costs and/or attorneys fees and such other relief as the court deems appropriate.

{¶ 11} The trial court issued discovery orders with the above-cited or substantially similar language three times prior to the state filing its motion in limine. *See* July 11, 2018, January 22, 2019, and February 4, 2019 trial court orders.

{¶ 12} The record demonstrates that the state complied with the trial court's discovery orders and exchanged its discovery and expert information with appellants in a timely fashion. Appellants neither objected to any of the state's filings nor did they file any motions to compel or strike.

**Motion In Limine**

{¶ 13} The trial was set for February 2020, and shortly before the date, the state filed a motion in limine to exclude appellants from presenting witnesses and evidence on financial inability. Riley did not file a response to the motion. In January 2020, the trial court granted the motion, stating, "[D]efendant Riley is precluded from presenting witnesses at trial other than defendant Riley himself, and is also precluded from presenting evidence or testimony in support of an inability to pay defense." The February 2020 trial date was subsequently continued.

{¶ 14} In December 2020, Riley filed a motion for reconsideration on the motion in limine and requested leave to call witnesses. Riley stated that he needed time to obtain records from multiple sources, request bank records and financial documents, and locate witnesses but claimed that he "can now identify and disclose all of the witnesses he intends to call at trial to the Court." Riley's motion did not provide a list of those witnesses. Further, Riley did not supplement his discovery responses with any of the records referenced in his motion. The trial court denied Riley's motion.

**Supplemental Consent Order**

{¶ 15} In June 2020, the trial court issued a supplemental consent order that resolved the state's claims against defendants Beynon, ARCO, and 1705 Noble Road Properties, LLC. The order required ARCO and 1705 Noble Road Properties, LLC to pay $2,744,000 and $2,306,000 in civil penalties, respectively. The order also imposed a civil penalty of $2,306,000 on Beynon, which the state held in abeyance in consideration of Beynon's financial condition and prior payments made during proceedings in bankruptcy court. Appellants were not parties to the supplemental consent order, and at the time of trial were the sole defendants.

{¶ 16} The case proceeded to a bench trial on three of the four counts in the amended complaint. Count 1 alleged appellants operated and maintained an unlicensed construction and demolition debris facility. Count 2 alleged they illegally disposed of construction and demolition debris. Count 4 alleged appellants created a common law public nuisance.[2]

**Facts: As Adduced from Discovery and Trial Testimony**

{¶ 17} At trial, the state presented the following witnesses: (1) defendant Beynon, (2) Stephen Bopple ("Bopple"), an environmental specialist with the Ohio EPA, (3) Barry Grisez ("Grisez"), a supervisor with the board of health, (4) Scott Hinkle ("Hinkle"), a former ARCO employee, and (5) expert witness Aaron Shear

---

[2] Count 3 related solely to defendant ARCO and was resolved through the supplemental consent order.

("Shear"), environmental supervisor with the division of materials and waste management, Ohio EPA. Riley did not testify.

**Formation and Operation of the Site**

{¶ 18} Beynon testified that she and Riley started dating in 2013. In April 2014, they formed ARCO and 1705 Noble Road Properties. According to Beynon, it was Riley's idea to form the companies and he also persuaded her to cash out an approximate $90,000 retirement account to fund Riley's business plan. Beynon testified that Riley told her that he was going through a divorce and because of those proceedings, the businesses would need to be set up in her name. Thus, Beynon was listed as ARCO's president and the account holder on ARCO's bank account. Beynon also signed paperwork securing a $500,000 line of credit for ARCO from a credit union where she was employed. Beynon and Riley then acquired real property — the site — from the city of East Cleveland to establish a construction and demolition debris facility. Riley executed a mortgage as the manager of 1705 Noble Road Properties to purchase the property.

{¶ 19} RCI contracted with the Cuyahoga County Land Bank to provide demolition services and to haul away and dispose of the resulting construction and demolition debris. In the spring of 2014, RCI started depositing debris from its demolition jobs for the land bank at the site. Beynon testified that the deposits occurred on a daily basis. Beynon explained that ARCO did not send any invoices to RCI, because ARCO employees understood that billing RCI would be futile because Riley operated both companies. RCI ceased operations in 2015.

{¶ 20} The evidence establishes that private homes border the site's southern property line on Noble Road, and businesses border the site's eastern property line on Euclid Avenue.

{¶ 21} Beynon and ARCO employee Hinkle testified that Riley: (1) controlled and managed ARCO's onsite operations, (2) hired and fired employees and set employee wages, (3) negotiated with vendors for equipment purchases and purchased equipment for the site using Beynon's name, (4) interacted with potential customers, (5) decided which customers could dispose onsite, and (6) determined the price each customer would pay to deposit waste onsite.

{¶ 22} Hinkle testified that Riley directed him to grade the pile and run the bulldozer to the top of the hill so that trucks could dump debris at the top of the pile. The debris was dumped on top of the pile without being sorted. Reusable materials were crushed and added to the debris pile to make new roads. Hinkle testified that when he told Riley he was running out of room, Riley told him to "[j]ust keep putting it higher."

{¶ 23} Riley held himself out to the public and regulators as a recycler of construction and demolition debris. To recycle construction and demolition debris, a facility must separate and sort the debris based on material type. The record demonstrates that Riley never obtained a construction and demolition debris or solid waste landfill license at any point during ARCO's operations.

**The Ohio EPA's Involvement**

{¶ 24} Bopple, from the Ohio EPA, testified that from June 2015 to the end of July 2016, the Ohio EPA and the board of health made at least 24 unannounced inspections of the site. Inspectors observed massive piles of debris, approximately 30 feet high, that towered over the neighboring homes. Inspectors spoke to Riley on at least 20 of those visits and discussed with him their concerns about the accumulation of debris. Bopple testified that on his visits he dealt directly with Riley. Bopple described Riley as "the heartbeat of the whole facility."

{¶ 25} Bopple further testified that when he and other EPA inspectors visited the site they rarely saw material being sorted for recycling, despite having told Riley that he needed to do so. Because of its concerns about Riley's stockpiling of debris, beginning in the summer of 2015, the Ohio EPA requested that ARCO document in monthly reports the quantity of debris that entered and exited the site.

{¶ 26} According to Bopple, the documentation submitted by ARCO demonstrated that it was in violation of laws governing the disposal and recycling of construction debris. The Ohio EPA notified Riley of ARCO's violations. In a June 3, 2016 letter, the Ohio EPA notified Riley that its review of ARCO's records from June 2015 to April 2016 showed that ARCO accepted 220,466 cubic yards of construction and demolition debris, but only 24,511 cubic yards, or 11% of the material brought on site, left the site for recycling or transport to a licensed disposal facility.

{¶ 27} Another letter from the Ohio EPA to ARCO notified Riley that its inspectors observed that some of the material ARCO reported to the Ohio EPA as outgoing, in particular, wood and cardboard, had not actually left the site. Bopple testified that even after his agency's issuance of these notices, inspectors did not notice a discernible decrease of debris on the site.

{¶ 28} Riley obtained a machine to sort recyclable materials from non-recyclable materials but told Bopple mechanical difficulties prevented him from using the machine. Bopple observed that the sorting machine did not have an operating conveyor belt and was not even connected to power. Riley eventually obtained an operable sorting machine, but Bopple testified that during his visits to the site, he observed the sorting machine operating only a few times. During those few times, Bopple did not see reusable material, other than metal, being sorted and separated. Other reusable materials were placed back on the pile as mixed waste.

{¶ 29} Bopple testified that successful recycling facilities use a nearly automated process with equipment that operates nonstop and can sort materials using magnets, hoppers, and optical scanners. Sorting occurred every time Bopple was onsite at those facilities.

{¶ 30} Inspectors noted that some clean hard fill was removed from other debris, but the clean hard fill was not moved off-site for an authorized recyclable use. Instead, the clean hard fill was put back on top of the debris pile to create a roadway. The debris on site was compacted and piled to such a height that it made

any reusable materials on the bottom of the pile no longer unchanged (i.e., it was decomposing) or retrievable.

**Expert Testimony:  Aaron Shear**

{¶ 31} Shear, environmental supervisor of the construction and demolition debris unit in Ohio EPA's division of materials and waste management, testified as an expert witness in the field of construction and demolition debris.

{¶ 32} Shear testified about the hazardous conditions that accumulated construction and demolition debris can create.  Decomposing and compacted debris are at risk of catching on fire.  There are also harmful toxins in these materials that may become airborne or leach into the soil and water supply, endangering human health and the environment.  When decomposing construction and demolition debris is exposed to the elements, leachate seeps into the ground, which can contaminate ground and surface water, endangering human health and the environment.  Nondecomposing construction and demolition debris, such as weathered shingles and roofing material, can also leach contaminants into ground and surface water.

{¶ 33} According to Shear, demolition debris from older homes in northeast Ohio, like the ones that Riley demolished for the land bank, is likely to contain industrial soot, lead paint, lumber treated with arsenic, asbestos, flame retardants, and carcinogenic agents found in insecticides and herbicides.

{¶ 34} Shear opined that construction and demolition debris was illegally disposed at the site because it was placed somewhere other than a licensed disposal

facility, its placement was not temporary, the debris was compacted and piled to the point that it was not retrievable, and the debris had decomposed and therefore had substantially changed.

**Riley's Removal from the Site**

{¶ 35} In August 2016, Beynon was granted a civil protection order that prohibited Riley from, among other things, coming within 500 feet of Beynon and from entering Beynon's residence or place of employment. Beynon testified that she was responsible for the site after Riley was banned from it until its closure in January 2017. ARCO continued to accept debris after Riley left, but only a fraction of what it took in while Riley was operating it.

**Closure and Cleanup of Site**

{¶ 36} On January 17, 2017, the Ohio EPA issued final findings and orders ("director's orders") against ARCO. The director's orders found that ARCO illegally disposed of construction debris and ordered that ARCO immediately cease acceptance of construction debris and dispose of all material onsite. At the time the director's orders were issued, the debris pile was approximately 50 feet high, 600 feet long, and 500 feet wide. ARCO shut down without removing or disposing of the construction debris. Beynon testified that after the director's orders, ARCO ceased operations but failed to remove the debris from the site.

{¶ 37} Witnesses who stood on top of the pile testified that they could look down on the two-story homes that surrounded the site. Neighboring residents had to endure loud noises, dust, odors, and the unsightly debris pile.

{¶ 38} In 2017, the board of health determined, after an evidentiary hearing, that the failure to remove materials off the site for recycling or disposal at a licensed disposal facility created a nuisance in violation of Ohio law.

{¶ 39} In June 2017, the Ohio EPA and the board of health entered into an agreement under which the board of health would administer cleanup of the site and the state would fund it. To effectuate the agreement, the Ohio EPA and defendants ARCO, Beynon, and 1705 Noble Road entered into the partial consent order, which: (1) gave the Ohio EPA and the board of health full access to the site for the purposes of debris removal and air monitoring operations, and (2) obligated defendants ARCO, Beynon, and 1705 Noble Road to repay the state for all funds expended for cleanup of the site.

{¶ 40} Grisez, a supervisor at the board of health explained the cleanup efforts. The cleanup started in mid-July 2017, occurred in multiple phases, and ended in March 2018. The first phase involved the removal, transport, and processing of approximately 82,000 cubic yards of hard fill material. The second phase involved the removal of the remaining 148,000 cubic yards of debris.

{¶ 41} Grisez testified that during the cleanup, in mid-October 2017, employees from the Ohio EPA and the board of health observed smoldering debris in the pile and alerted the East Cleveland Fire Department. Due to the local fire department's limited resources, it was unable to completely extinguish the fire. Instead, the fire department provided a hose to keep water flowing onto the smoldering pile, and employees from the Ohio EPA and board of health monitored

the site and kept the debris pile wet. However, on October 30, 2017, a large fire erupted on the site. The flames reached a height of approximately six to eight feet and spread across a distance of approximately 20-30 feet. Fighting the fire required the assistance of over a dozen local fire departments. The resulting smoke was hazardous and could be smelled from miles away. It took a week to completely extinguish the fire and required the use of approximately 13 million gallons of water.

{¶ 42} The cleanup efforts continued after the fire. During that time, the pile began to smolder again, and to protect public health and the environment the board of health expedited removal, at added cost, of material from the site to prevent the further spread of fire. The final cost of removal was $9,143,860.47.

{¶ 43} Shear testified that the Ohio EPA paid approximately $82,000 in payroll costs for cleanup of the site for fiscal years 2017 and 2018. There were additional payroll costs incurred by the agency as well. Grisez testified as to various other associated costs as well.

**Trial Court's Decision**

{¶ 44} The trial court issued findings of fact and conclusions of law after the bench trial. On Count 1, the court found that Riley operated an unlicensed construction and demolition debris facility. On Count 2, the court found that both Riley and RCI engaged in the illegal disposal of construction and demolition debris. The court further found that throughout Riley's dealings with the Ohio EPA he defied and ignored the agency's guidance. On Count 4, the court found Riley and

RCI created a public nuisance and were jointly and severally liable for approximately $9 million in restitution to the Ohio EPA for the site cleanup.

{¶ 45} The trial court concluded that the evidence of risk of harm to public health and the environment, the economic benefit that Riley enjoyed from avoiding the costs of compliance, his "blatant defiance" of the law, and the "extraordinary" enforcement costs incurred by the state warranted the maximum statutory penalty of $10,000 per day of violation. The court imposed on Riley the maximum civil penalty of $7,710,000 for operating an unlicensed facility from June 24, 2014, until August 2, 2016, the date of Riley's removal from the site. The court imposed on Riley and RCI, jointly and severally, the maximum civil penalty of $13,680,000 for their illegal disposal of construction and demolition debris from June 24, 2014, to March 23, 2018, the date the site cleanup was complete.

{¶ 46} Appellants now appeal from the trial court's judgment.

**Assignments of Error**

FIRST ASSIGNMENT OF ERROR

The trial court abused its discretion by prohibiting the defendants from offering any exhibits and from calling any witnesses at trial, including rebuttal or impeachment witnesses or evidence.

SECOND ASSIGNMENT OF ERROR

The trial court erred, to the substantial prejudice of the defendant[s]-appellants, by finding liability under count one of the amended complaint.

THIRD ASSIGNMENT OF ERROR

The state of Ohio failed to sustain its burden of proof, of clear and convincing evidence, at trial, as to any of the four counts in the amended complaint.

FOURTH ASSIGNMENT OF ERROR

The civil penalties and clean-up costs imposed against Mr. Riley individually are so grossly disproportionate to the alleged misconduct of Mr. Riley that they are unenforceable under the Due Process Clause, the Equal Protection Clause of the Fourteenth Amendment and under the Eighth Amendment to the United States Constitution, which protects citizens against excessive civil fines.

**Law and Analysis**

**Motion in Limine**

{¶ 47} In their first assignment of error, the appellants challenge the trial court's judgment granting the state's motion in limine, which prevented the appellants from presenting witnesses, with the exception of Riley.  The appellants contend that the state "bypassed all of the Civil Rule 37 motions and procedures," and that the trial court "summarily" granting it evidenced the court's "bias and vindictiveness" against them.  Appellants contend that they responded to the state's discovery requests, but "apparently not to the [state's] liking."

{¶ 48} Initially, we note that appellants did not oppose the motion in limine. In light of appellant's failure to object, we can only take notice of plain error.  *In re A.D.*, 8th Dist. Cuyahoga No. 85648, 2005-Ohio-5441, ¶ 7.

{¶ 49} The application of a plain-error review is limited to "extremely rare situations in which the plain-error doctrine must be invoked in order to prevent a manifest miscarriage of justice, since the result reached by the trial court is patently"

contrary to law. *Reichert v. Ingersoll*, 18 Ohio St.3d 220, 223-224, 480 N.E.2d 802 (1985). "[T]he doctrine is sharply limited to the extremely rare case involving exceptional circumstances where the error, left unobjected to at the trial court, rises to the level of challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997).

{¶ 50} Appellants failed to oppose the state's motion in limine, failed to object at trial, and their motion for reconsideration neither identified their proposed witnesses nor the witnesses' anticipated testimony. For the reasons that follow, we find no error, plain or otherwise, with the trial court's ruling.

{¶ 51} The purpose of the discovery rules is to prevent surprise and the secreting of evidence favorable to one party. *Stross v. Laderman*, 8th Dist. Cuyahoga No. 74686, 1999 Ohio App. LEXIS 4452 (Sept. 23, 1999), citing *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3, 511 N.E.2d 1138 (1987). "This is accomplished by way of a discovery procedure which mandates a free flow of accessible information between the parties upon request, and which imposes sanctions for failure to timely respond to reasonable inquiries." *Jones v. Murphy*, 12 Ohio St.3d 84, 86, 465 N.E.2d 444 (1984).

{¶ 52} Civ.R. 26(E) requires a party to "seasonably supplement his [or her] response" to a request for discovery in certain circumstances, including, where (1) a response to any question directly addresses "(a) the identity and location of persons having knowledge of discoverable matters, and (b) the identity of each person expected to be called as an expert witness at trial and the subject matter on which

he [or she] is expected to testify"; and (2) a party knows or later learns that his or her response is incorrect. Civ.R. 26(E)(1) and (2).

{¶ 53} Civ.R. 37(B)(2)(b) provides, "If a party * * * fails to obey an order to provide or permit discovery * * *, the court may issue further just orders. They may include * * * [p]rohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence[.]"

{¶ 54} "Civ.R. 37 authorizes the court to make 'just' orders in response to violations of the discovery rules or court orders." *Laubscher v. Branthoover*, 68 Ohio App.3d 375, 381, 588 N.E.2d 290 (11th Dist.1991). A court may sanction a party for failing to comply with a discovery order by excluding evidence. *Billman v. Hirth*, 115 Ohio App.3d 615, 620, 685 N.E.2d 1287 (10th Dist.1996). A court's determination to impose a discovery sanction will not be reversed on appeal unless the trial court abused its discretion. *Fone v. Ford Motor Co.*, 128 Ohio App.3d 492, 715 N.E.2d 600 (8th Dist.1998); *Cunningham v. Garruto*, 101 Ohio App.3d 656, 659, 656 N.E.2d 392 (3d Dist.1995); *Fiorini v. Whiston*, 92 Ohio App.3d 419, 424, 635 N.E.2d 1311 (1st Dist.1993).

{¶ 55} Prior to the state filing its motion in limine, the trial court issued three discovery orders that contained the following or substantially similar language:

> Parties are to abide by the standing orders of the court located on the court's website. Failure to comply with the court's order may result in sanctions including but not limited to prohibiting the introduction of evidence at trial, limiting or dismissal of claims and/or defenses,

granting of costs and/or attorneys fees and such other relief as the court deems appropriate.

*See* July 11, 2018, January 22, 2019, and February 4, 2019 trial court orders.

{¶ 56} The record in this case demonstrates that the state served its first set of discovery requests in June 2018. In that discovery, the state requested that Riley identify every person he intended to call as an expert or lay witness and to provide any reports or documents prepared by or received by his expert witness. Riley objected and responded that he would provide the requested information in accordance with the trial court's pretrial order. The state also asked Riley to confirm whether he intended to claim financial inability to pay the civil penalties or injunctive relief. Riley stated that he was unable to evaluate an inability to pay but that if he were to present evidence of inability to pay, "all documents * * * related to his financial condition will be made available for review."

{¶ 57} A year after the state disclosed its witnesses, Riley told the state's counsel that he would provide a witness list by May 13, 2019. The date passed with no disclosures from Riley. Rather, Riley advised the state's counsel that he *would not be calling any fact or expert witnesses at trial* and that he was not taking any depositions of Ohio EPA employees or other state witnesses. Riley still did not provide any documentation supporting his financial inability to pay.

{¶ 58} The trial court granted the state's motion in limine in January 2020. The case then lingered until December 2020, when Riley filed a motion for reconsideration of the motion in limine, contending that he could "now identify and

disclose all of the witnesses he intends to call at trial to the Court." Notably, he did still not identify those witnesses in his motion. The trial court denied his request.

{¶ 59} Riley contends that in the absence of bad faith on his part, the trial court abused its discretion by ordering the exclusion of witnesses and evidence, rather than requiring the state to pursue first a motion to compel discovery. Riley's contention misses the point that he told the state's counsel that he would not be calling any fact or expert witnesses at trial and that he would not be deposing any Ohio EPA employees or other state witnesses. Thus, there was no need for the state to seek an order from the court compelling Riley to provide his discovery. Further, Riley did not oppose the state's motion in limine and did not object at trial. Moreover, "under Civ.R. 37(C), no court order is required before a court can impose sanctions for failing to supplement or correct prior discovery responses." *Heaton v. Ford Motor Co.*, 8th Dist. Cuyahoga No. 104636, 2017-Ohio-7479, ¶ 33.

{¶ 60} The Supreme Court of Ohio has held that even if a party's noncompliance with discovery was not willful, "the existence and effect of prejudice resulting from noncompliance with the disclosure rules is of primary concern, not just the intent or motive involved." *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 85, 482 N.E.2d 1248 (1985). Thus, the court held that "'Civ.R. 37 permits the exclusion of expert testimony pursuant to a motion in limine as a sanction for the violation of Civ.R. 26(E)(1)(b).'" *Id.*, quoting *Murphy*, 12 Ohio St.3d 84 465 N.E.2d 444, at syllabus.

{¶ 61} We find that the trial court's use of its discretion in enforcing a discovery sanction in this case was warranted. The trial court's exclusion of Riley's witnesses and evidence for his failure for over three years to disclose them was not an abuse of discretion. The action taken by the trial court was wholly within its discretion and authority. We find no error, plain or otherwise. The first assignment of error is overruled.

**Burden of Proof**

{¶ 62} In the second and third assignments of error, appellants contend that the state failed to sustain its burden of proving the subject three counts of the amended complaint by clear and convincing evidence. The state contends that the burden of proof for statutory violations is preponderance of the evidence, but maintains that regardless of which standard is used, it met its burden.

{¶ 63} The amended complaint was for "injunctive relief." Some courts have held that a plaintiff may obtain injunctive relief when it can show, by a preponderance of the evidence, that the statutory requirements are fulfilled. *See, e.g., New Holland v. Murphy*, 4th Dist. Pickaway No. 18CA6, 2019-Ohio-2423, ¶ 26; *Kmotorka v. Wylie*, 6th Dist. Wood Nos. WD-11-018 and WD-11-026, 2013-Ohio-321, ¶ 48. However, this court has held that a plaintiff in an action for a temporary or permanent injunction must prove his or her case by clear and convincing evidence. *See, e.g., State ex rel. Yost v. Baumann's Recycling Ctr., LLC*, 8th Dist. Cuyahoga No. 108706, 2020-Ohio-1504, ¶ 23, *Pointe at Gateway Condo. Owner's Assn. v. Schmelzer*, 8th Dist. Cuyahoga Nos. 98761 and 99130, 2013-Ohio-3615, ¶

73, citing *Franklin Cty. Dist. Bd. of Health v. Paxon*, 152 Ohio App.3d 193, 2003-Ohio-1331, 787 N.E.2d 59, ¶ 25 (10th Dist.). In accordance with our precedent, the state was required to prove its case by clear and convincing evidence. Clear and convincing evidence is that "'which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *State v. Eppinger*, 91 Ohio St.3d 158, 164, 743 N.E.2d 881 (2001), quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). We now consider the second and third assignments of error under the clear and convincing evidence standard.

**Operating an Unlicensed Construction and Demolition Debris Facility; Illegal Disposal of Construction and Demolition Debris**

{¶ 64} In their second assignment of error the appellants contend that the state failed to prove by clear and convincing evidence, under Count 1 of the amended complaint, that the appellants engaged in disposal of construction and demolition debris at the site without a license. According to appellants, they were engaged in storage and recycling of the debris at the site and, therefore, were not required to have a license as the state contends. In their third assignment of error, appellants contend that the state failed to meet its burden of proof as to the subject three counts of the amended complaint. We disagree.

{¶ 65} R.C. 3714.06(A) prohibits a person from operating or maintaining a construction and demolition debris facility or processing facility without first obtaining a license from the Ohio EPA or the applicable board of health in which the facility is located. "Facility" means "any site, location, tract of land, installation, or

building used for the disposal of construction and demolition debris." R.C. 3714.01. "Disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, emitting, or placing of any construction and demolition debris into or on any land or ground or surface water or into the air, except if the disposition or placement constitutes storage." *Id.*

{¶ 66} "Illegal disposal" occurs when construction and demolition debris is placed anywhere other than a licensed landfill. Ohio Adm.Code 3745-400-01(I)(1). To constitute "stored" construction and demolition debris, the material must meet all three of the following conditions: (1) its placement must be temporary, (2) in such a manner that the material remains retrievable, and (3) substantially unchanged. R.C. 3714.01. At the end of the temporary period of storage, the material must be disposed or reused or recycled in a beneficial manner. *Id.*

{¶ 67} The evidence at trial clearly demonstrated that Riley established, operated, or maintained the site as a construction and demolition debris facility in violation of R.C. 3714.06(A). The evidence demonstrated that Riley was taking in far more debris than was ever leaving the facility. The Ohio EPA began collecting data in June 2015 on how much debris entered and exited the site on a monthly basis. The data demonstrated that Riley was bringing in material at a rate *ten times* greater than the rate of material that exited the facility. From June 2015 to April 2016, only 11% of the material brought onsite left the site for recycling or transport to a licensed disposal facility. From June 2015 to December 2016, a total of approximately 344,031 cubic yards of debris had accumulated on the site.

Inspectors also observed that some of the material that Riley reported to the Ohio EPA as outgoing — specifically, wood and cardboard — had not actually left the site.

{¶ 68} The state's witnesses also testified about the limited amount of recycling that occurred at the site. Ohio EPA inspector Bopple made numerous onsite inspections starting in June 2015. Bopple testified that during his initial inspections the sorting machine on site did not have an operating conveyor belt and was not even connected to power. Riley eventually obtained an operable sorting machine, but Bopple testified that during his visits to the site, he observed the sorting machine operating only a few times. During those few times, Bopple did not see reusable material, other than metal, being sorted and separated. Other reusable materials were placed back on the pile as mixed waste.

{¶ 69} Bopple contrasted what he saw at the site with other successful recycling facilities, which use a nearly automated process with equipment that operates nonstop and can sort materials using magnets, hoppers, and optical scanners. At those facilities, sorting occurred every time Bopple was onsite for a visit.

{¶ 70} Former ARCO employee Hinkle testified that Riley directed him to grade the pile and run the bulldozer to the top of the hill so that trucks could dump debris at the top of the pile. Truckloads of debris were dumped on top of the pile without being sorted. Reusable materials were crushed and added to the debris pile to make new roads. When Hinkle talked to Riley about running out of room, Riley told Hinkle to "[j]ust keep putting it higher." Shear, the state's expert, testified that

operators of landfills do this to maximize disposal space. Shear further testified that piling debris in this manner necessarily means that material in the middle of the pile is not retrievable. Moreover, the crushing and compacting of debris with trucks and bulldozers driving on the debris pile means that the material is no longer substantially unchanged.

{¶ 71} Riley contends that the Ohio EPA's definition of "storage" does not further define "temporary," "retrievable," and "substantially unchanged" and, therefore, subjected him to arbitrary enforcement. The Ohio EPA's rules mirror the Ohio Revised Code. R.C. 3714.01 defines "storage" as "the holding of construction and demolition debris for a temporary period in such a manner that it remains retrievable and substantially unchanged and, at the end of the period, is disposes of or reused or recycled in a beneficial manner." The plain language of the rules put Riley on notice of what constituted storage. *See State ex rel. Pennington v. Gundler*, 75 Ohio St.3d 171, 173, 661 N.E.2d 1049 (1996) (words used in a statute are to be given their usual, normal, and customary meaning.).

{¶ 72} Riley argues that the failures were those of his ex-girlfriend Beynon in an attempt to shift the blame. We are not persuaded by this. The evidence demonstrates that Riley held himself out as the person primarily responsible for ARCO's managerial and operational decisions. As Bopple testified, Riley "was the heartbeat of the whole facility and was running it." It is true that Riley could no longer run the site after his removal therefrom. The trial court accounted for that, however, and found that Riley operated the illegal landfill until August 2, 2016, the

day of his removal from the site. Additionally, the evidence demonstrates that the majority of the debris was disposed on the site prior to Riley's removal.

{¶ 73} The record before us demonstrates that the state presented clear and convincing evidence that Riley established, operated, and maintained ARCO as a construction and demolition debris facility and engaged in the illegal disposal of construction and demolition debris thereon. We affirm the trial court's verdict as to Count 1 and Count 2 of the amended complaint.

**The Site Constituted a Nuisance**

{¶ 74} Count 4 of the amended complaint alleged that appellants created a public nuisance by their operations at the site. A public nuisance is an unreasonable interference with a right common to the public. *Brown v. Scioto Bd. of Commrs.*, 87 Ohio App.3d 704, 712, 622 N.E.2d 1153 (4th Dist.1993).

> "Unreasonable interference" includes those acts that significantly interfere with public health, safety, peace, comfort, or convenience, conduct that is contrary to a statute, ordinance, or regulation, or conduct that is of a continuing nature or one which has produced a permanent or long-lasting effect upon the public right, an effect of which the actor is aware or should be aware.

*Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d 416, 2002-Ohio-2480, 768 N.E.2d 1136, ¶ 8.

{¶ 75} The evidence establishes that the accumulation of debris at the site significantly interfered with the public health, safety, peace, comfort, and convenience of the neighbors. The pile of debris reached a height of 30 – 40 feet and towered over neighboring homes. When standing on top of the pile, witnesses testified they could look down on the two-story houses that surrounded the site.

Neighboring residents had to endure loud noises, dust, odors, the large unsightly debris pile, and the constant threat of environmental hazards. Indeed, the appellants' illegal disposal and failure to remove the debris created great concern when a fire broke out, engulfing the site in October 2017.

{¶ 76} On this record, the state proved by clear and convincing evidence that appellants created a public nuisance on the site.

{¶ 77} The second and third assignments of error are overruled.

**Penalties and Costs not Excessive**

{¶ 78} In the final assignment of error Riley contends that the civil penalties imposed on him are grossly disproportionate in violation of the Eighth Amendment to the U.S. Constitution.[3]

{¶ 79} The Eighth Amendment to the U.S. Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." "Historically, the Eighth Amendment has been invoked in extremely rare cases, where it has been necessary to protect individuals from inhumane punishment such as torture or other barbarous acts." *State v. Weitbrecht*, 86 Ohio St.3d 368, 370, 715 N.E.2d 167 (1999). Further, the Eighth Amendment prohibition against excessive fines does not generally apply to civil orders. *Ohio Elections Comm. v. Ohio Chamber of Commerce & Citizens for a Strong Ohio*, 158 Ohio App.3d 557, 2004-Ohio-5253, 817 N.E.2d 447, ¶ 33-34 (10th

---

[3] The fourth assignment of error also refers to the Due Process and Equal Protection Clauses, but appellants do not advance any argument relative to them. We therefore decline to address them.

Dist.); *Cleveland v. Paramount Land Holdings, LLC.*, 8th Dist. Cuyahoga Nos. 96180, 96181, 96182, and 96183, 2011-Ohio-5382, ¶ 23.

{¶ 80} The assessment of an appropriate civil penalty lies within the sound discretion of the trial court and will not be reversed on appeal absent evidence that the trial court abused its discretion in imposing the penalty. *State ex rel. Brown v. Dayton Malleable, Inc.*, 1 Ohio St.3d 151, 157, 438 N.E.2d 120 (1982); *State ex rel. Cordray v. Morrow Sanit. Co.*, 5th Dist. Morrow No. 10CA10, 2011-Ohio-2690, ¶ 27; and *State v. Tri-State Group, Inc.*, 7th Dist. Belmont No. 03BE61, 2004-Ohio-4441. To ensure that the penalty will be significant enough to affect the violator and deter future violations, the trial court has the discretion to determine the exact amount of the penalty. *Morrow Sanit. Co.* at *id.*, citing *State ex rel. Montgomery v. Maginn*, 147 Ohio App.3d 420, 426-427, 770 N.E.2d 1099 (12th Dist.2002). In determining the amount of the penalty, "the court should consider evidence relating to defendant's recalcitrance, defiance, or indifference to the law; the financial gain that accrued to defendant; the environmental harm that resulted; and the extraordinary costs incurred in enforcement of the law." *Morrow Sanit. Co.* at *id.*

{¶ 81} It has been explained that "[c]ivil penalties can be used as a tool to implement a regulatory program." *State ex rel. Brown v. Howard*, 3 Ohio App.3d 189, 191, 444 N.E.2d 469 (10th Dist.1981), citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). Substantial penalties are used as a mechanism to deter conduct contrary to the regulatory program. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 231-232, 95 S.Ct. 926, 43 L.Ed.2d 148

(1975); *Dayton Malleable, Inc.*, at *id.* "'[B]ecause the function of a monetary penalty is to *deter* the * * * activity altogether and thus not give rise to the penalty at all, the amount of the penalty must be *greater than* abatement or compliance costs.'" (Emphasis sic.) *Dayton Malleable, Inc.*, at *id.*, quoting Notes, *Assessment of Civil Monetary Penalties for Water Pollution: A Proposal for Shifting the Burden of Proof Regarding Damages*, 30 Hastings L.J. 651, 670 (1979); *see also Morrow Sanit. Co.* at ¶ 26.

{¶ 82} R.C. 3714.11(B) provides that a trial court may impose a penalty of not more than $10,000 per day for each violation of R.C. Chapter 3714, a rule adopted under it, or an order issued under it. The trial court found that Riley is liable for civil penalties resulting from his unlicensed operation of a construction and demolition debris facility as alleged in Count 1. The court also found that Riley is liable for civil penalties resulting from his illegal disposal of construction and demolition debris as alleged in Count 2.

{¶ 83} The court found that appellants "caused an extreme risk of harm, both severe and imminent, to the public and to the environment." It noted that the debris "created a severe and imminent risk of harmful toxins and carcinogenic agents — such as arsenic, lead, DDT and asbestos — leaching into the ground and surface water." It also noted the fire that erupted at the site, which lasted for days and required the assistance of numerous fire departments to extinguish. This is the very sort of unmitigated environmental disaster that caused President Richard M. Nixon to create the Environmental Protection Agency.

{¶ 84} In regard to Riley's economic benefit, the court found it was "substantial." The court reasoned that he avoided the costs "normally incurred by the operator or owner of a legitimate construction and demolition debris landfill * * * [and associated with] removing debris from the site, transporting the debris to a properly licensed landfill, and the fees for lawful disposal at a licensed landfill."

{¶ 85} The court further found that Riley's "blatant recalcitrance" warranted the imposition of the maximum statutory penalty. In so finding, the court stated:

> Despite multiple enforcement efforts from the Ohio EPA, Riley continued to defy Ohio law at every step of the way from his steady involvement with the local Board of Health to state-level regulators at the Ohio EPA. He ignored the Ohio EPA's good-faith efforts to offer guidance and demonstrated no interest in operating a legitimate recycling facility. Riley's deliberate indifference to the law diminished the quality of life for his East Cleveland neighbors and jeopardized their health and well-being.
>
> Riley knowingly and personally deposited well over 200,000 cubic yards of waste in [a] residential East Cleveland neighborhood while profiting and thwarting all regulatory enforcement. Riley's open recalcitrance and callous disregard for the public health and the environment weigh in favor of imposing the maximum civil penalty.

{¶ 86} In regard to costs, the trial court held that the state incurred "substantial extraordinary costs." Those costs included expenditures for: (1) collecting and reviewing the monthly data relative to the incoming and outgoing debris at the site; (2) removal of the debris ($9,143,860.47); (3) combating the fire at the site; and (4) litigation.

{¶ 87} Upon review, the trial court did not abuse its discretion in its imposition of penalties on appellants. All of the above-mentioned findings made by the trial court were supported by the evidence. Moreover, appellants failed to

comply with the state's discovery requests to provide evidence regarding their inability to pay the penalties; they cannot now successfully maintain that they are unable to pay. The fourth assignment of error is therefore overruled.

{¶ 88} Judgment affirmed.

It is ordered that appellee recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
CORNELIUS J. O'SULLIVAN, JR., JUDGE

LISA B. FORBES, P.J., and
EMANUELLA D. GROVES, J., CONCUR